UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

ABDUL-HAMZA WALI MUHAMMAD,  )
               Plaintiff,  )     Civil Action No. 7:14cv00529
                        )
v.  )     **REPORT & RECOMMENDATION**
                        )
COMMONWEALTH OF  )
VIRGINIA, *et al.*,  )     By:    Joel C. Hoppe
             Defendants.  )     United States Magistrate Judge

This matter is before the Court on the Defendants' Motion to Dismiss, or in the Alternative for Summary Judgment, ECF No. 101, and a number of motions filed by the Plaintiff, ECF Nos. 146, 147, 152. The motions are before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 149. Having considered the parties' pleadings, all supporting materials, and the applicable law, I respectfully recommend that the presiding District Judge grant in part and deny in part the Defendants' motion and deny the Plaintiff's motions.

## I. Procedural History

Plaintiff Abdul-Hamza Wali Muhammad, a prisoner at Red Onion State Prison ("ROSP") proceeding *pro se*, filed a civil action on September 26, 2014, ECF Nos. 1 through 1-1, and an amended complaint on October 20, 2014,[1] ECF Nos. 13 through 13-6. He brings this action against the Commonwealth of Virginia and the following officials, each in their official and individual capacities: Harold W. Clarke, A. David Robinson, Brian Keith Dawkins, Helen Scott Richeson, Gerald K. Washington, Adina L. Pogue, Mark E. Engelke, P. Scarberry, Randall Charles Mathena, John F. Walrath, Sherri Shortridge, Jeffrey C. Artrip, Geraldine G. Baker, A. J. Gallihar, Dewayne A. Turner, Stacy L. Day, Reanne Kegley, CMC Jackson, S. Fletcher,

---

[1] The Court has since denied Muhammad's repeated attempts to amend his complaint piecemeal. *See, e.g.*, ECF Nos. 42, 46, 59.

1

Lieutenant C. Stanley, Sergeant Eric Anthony Miller, Sergeant Clinton Deel, Sergeant John Messer, J. W. Coyle, C. Bishop, A. J. Vaughan, Lieutenant Steven B. Franklin, Lieutenant James Lyall, Lieutenant Justin Kiser, George Hinkle, Larry W. Jarvis, John McQueen, Sergeant C. Dixon, Unit Manager Tori M. Raiford, Missy L. Counts, Captain D. Still, A. Murphy, B. Akers, D. Williams, Larry I. Mullins, N. H. Cookie Scott, Debra D. Gardner, Paul Moceri, and Rena Mullins.[2] ECF No. 1-1, at 5; ECF No. 13, at 1. Muhammad also names "Dual Treatment Team Members" as Defendants, ECF No. 1-1, at 5, although the members of the Dual Treatment Team are already named as individual Defendants, ECF No. 104, at 14.

Muhammad's complaint, as amended, asserts six separate claims. First, he alleges that he was misclassified on May 21, 2014, and thereby improperly kept in segregation. Second, he asserts that the Common Fare diet he receives at ROSP is incompatible with his religious beliefs. Third, he alleges that he was prevented from celebrating Muslim holy days and feasts in 2014. Fourth, he claims that he was unfairly disciplined after an attack by another inmate that occurred on January 5, 2013. Fifth, he alleges that corrections officers failed to intervene to protect him during that attack. Finally, in his sixth claim, he alleges that he was unfairly disciplined on a charge of urinating in a classroom. Muhammad brings his claims pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq.*[3] He seeks declaratory relief, injunctive relief, and monetary damages. *See generally* ECF Nos. 1 through 1-1, 13 through 13-6.

---

[2] The Defendants' names and their spelling are as provided by the Defendants themselves. *See* ECF Nos. 34, 64, 80. Muhammad has listed many of these Defendants using different spellings and occasionally the wrong first or last names.

[3] Muhammad's filings also contain citations to other federal statutes, including the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as well as various Virginia constitutional and statutory provisions. He has not made any attempt to explain how these are relevant to his § 1983

2

Defendants filed their answer, ECF No. 81, and subsequently moved for dismissal or, in the alternative, for summary judgment, ECF No. 101. In support of their motion, Defendants filed a brief with attached exhibits, including the affidavits of Defendants Scarberry, Engelke, Counts, Bishop, and Larry Mullins. ECF Nos. 102 through 102-5. Muhammad filed his brief in response to Defendants' motion on April 3, 2015. ECF No. 104. On September 21, 2015, Muhammad filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), and requesting a pretrial hearing.[4] ECF No. 147. In addition, Muhammad has moved for discovery sanctions against the Defendants, ECF No. 146, and for a preliminary injunction, ECF No. 152.

## II. Motions to Dismiss, or in the Alternative, for Summary Judgment[5]

### A. *Standards of Review*

A complaint must "state[] a plausible claim for relief" that "permit[s] the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). In making this determination, the Court accepts as true all well-pled facts and construes those facts in the light most favorable to the plaintiff. *Philips*, 572 F.3d at 180. The Court need not accept

---

and RLUIPA claims, and to the extent he seeks to assert a separate cause of action under any of these provisions, he provides no supporting argument. Muhammad also claims multiple violations of Virginia Department of Corrections ("VDOC") policies and procedures, which are not actionable as such. *White v. Turner*, No. 7:14cv505, 2015 WL 8363084, at *3 (W.D. Va. Dec. 8, 2015) (citing *Riccio v. Cnty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990)). Thus, I only consider Muhammad's claims under § 1983 and RLUIPA.

[4] Muhammad's request for a pretrial hearing is premature. Moreover, he does not provide a specific purpose for the hearing, and it is apparent that the motions can be decided based on the parties' filings. Thus, Muhammad's request for a hearing is denied.

[5] Because Muhammad and Defendants have both submitted affidavits and other evidence to the Court, I will treat Defendants' motion to dismiss, or in the alternative for summary judgment, ECF No. 101, and Muhammad's motion for judgment on the pleadings, ECF No. 147, as cross-motions for summary judgment. Fed. R. Civ. P. 12(d).

3

legal conclusions, formulaic recitation of the elements of a cause of action, or "bare assertions devoid of further factual enhancements," however, as those are not well-pled facts for Rule 12(b)(6)'s purposes. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

Plaintiffs must plead enough facts to "nudge[] their claims across the line from conceivable to plausible," and the Court should dismiss a complaint that is not "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Federal courts have an obligation to construe *pro se* pleadings liberally, so that any potentially valid claim can be fairly decided on its merits rather than the *pro se* litigant's legal acumen. *Rankin v. Appalachian Power Co.*, No. 6:14cv47, 2015 WL 412850, at *1 (W.D. Va. Jan. 30, 2015) (citing *Boag v. MacDougall,* 454 U.S. 364, 365 (1982)). Still, "a *pro se* plaintiff must . . . allege facts that state a cause of action, and district courts are not required 'to conjure up questions never squarely presented to them.'" *Considder v. Medicare*, No. 3:09cv49, 2009 WL 9052195, at *1 (W.D. Va. Aug. 3, 2009) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)), *aff'd*, 373 F. App'x 341 (4th Cir. 2010).

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014) (per curiam). Facts are material when they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists if "a reasonable jury could return a verdict in

favor of the nonmoving party." *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) (citing *Anderson*, 477 U.S. at 248).

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Appalachian Power Co. v. Arthur*, 39 F. Supp. 3d 790, 796 (W.D. Va. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party makes that showing, the nonmoving party must then produce sufficient admissible evidence to establish a specific material fact genuinely in dispute. *See* Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007). When deciding a summary judgment motion, the Court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the nonmoving party's favor given the record as a whole.[6] *See Tolan*, 134 S. Ct. at 1866; *Scott*, 550 U.S. at 380. The Court does not weigh evidence, consider credibility, or resolve disputed issues—it decides only whether the record reveals a genuine dispute over material facts. *Tolan*, 134 S. Ct. at 1866.

B.    *Defendants' Motion*

1.    *Section 1983 "Personhood"*

Before reaching the merits of Muhammad's case, it is necessary to address the Defendants' argument regarding "personhood" status under § 1983. States, and government

---

[6] Review of the record as a whole is made more difficult by the sheer volume of documents Muhammad has filed throughout the litigation, many of which are incomprehensible or irrelevant. Muhammad has persisted with this haphazard manner of filing in spite of the Court's admonishments to submit documents in a more organized fashion. *See, e.g.*, ECF Nos. 46, 94. In addition, Muhammad does not cite to any of the materials on record in his arguments against the Defendants' motion and in favor of his own. Under Rule 56, "the court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Even in light of the leniency accorded Muhammad due to his *pro se* status, the Court will only consider evidentiary submissions that appear relevant to his claims and arguments on summary judgment. The Court cannot be expected to comb through the record in search of facts which Muhammad has failed to bring to its attention. *See Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 395–96 (4th Cir. 1994); *accord Brown v. Flowers*, 196 F. App'x 178, 182 (4th Cir. 2006).

5

entities that are considered "arms of the state," are not liable for monetary damages under § 1983 because they are not "persons" within the meaning of that statute. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Similarly, state officials sued in their official capacities are not "persons" under § 1983. *Id.* at 71. Thus, I recommend that summary judgment be granted in favor of the Commonwealth of Virginia on all claims and granted in favor of all Defendants sued in their official capacities to the extent Muhammad seeks monetary damages.

2.    *Muhammad's Security Classification*

Muhammad's first claim alleges that he was wrongly misclassified through an Institutional Classification Authority ("ICA") hearing and has since been improperly held in segregation. He asserts that this decision violated his Fourteenth Amendment right to procedural due process and his Eighth Amendment right against cruel and unusual punishment.[7] ECF No. 1-1, at 1; ECF No. 13-1, at 2. To the extent that Muhammad has intended to assert claims for violations of the First Amendment's Establishment Clause or the Fifth Amendment's prohibition against double jeopardy, these claims are frivolous. He also states that the classification decision was a form of retaliation for Muhammad having challenged the Defendants' judgment. *Id.* To the extent Muhammad claims that the Defendants' actions were unlawful retaliation against protected speech, his conclusory allegations fail to identify any protected speech he made or establish that his speech was a substantial or motivating factor in any actions taken by the Defendants. *See Makdessi v. Fleming*, No. 7:13cv79, 2014 WL 5384596, at *2 (W.D. Va. Sept. 22, 2014) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994); *Wagner v. Wheeler*, 13 F.3d 86, 90–91 (4th Cir. 1993)), *aff'd* No. 15-7112, 2015 WL 9273105 (4th Cir. Dec. 21, 2015). I therefore recommend that summary judgment be entered in the Defendants' favor in so far as these claims assert violations of the First and Fifth Amendments.

---

[7] Muhammad seemingly alleges other constitutional violations in this claim. In his original Complaint, Muhammad tacks on the phrase "establishment clause violation" at the end of his claim, ECF No. 1-1, at 1, and in his Amended Complaint states that the facts alleged in his claim constitute double jeopardy, ECF No. 13-1, at 2. To the extent that Muhammad has intended to assert claims for violations of the First Amendment's Establishment Clause or the Fifth Amendment's prohibition against double jeopardy, these claims are frivolous. He also states that the classification decision was a form of retaliation for Muhammad having challenged the Defendants' judgment. *Id.* To the extent Muhammad claims that the Defendants' actions were unlawful retaliation against protected speech, his conclusory allegations fail to identify any protected speech he made or establish that his speech was a substantial or motivating factor in any actions taken by the Defendants. *See Makdessi v. Fleming*, No. 7:13cv79, 2014 WL 5384596, at *2 (W.D. Va. Sept. 22, 2014) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994); *Wagner v. Wheeler*, 13 F.3d 86, 90–91 (4th Cir. 1993)), *aff'd* No. 15-7112, 2015 WL 9273105 (4th Cir. Dec. 21, 2015). I therefore recommend that summary judgment be entered in the Defendants' favor in so far as these claims assert violations of the First and Fifth Amendments.

In December 2012 Muhammad was released from Security Level S to Security Level 6 after completing the necessary programming under local operating procedures.[8] ECF No. 1, at 2; ECF No. 1-1, at 1; ECF No. 13-1, at 1–2. After receiving a number of disciplinary charges, which he characterizes as retaliatory,[9] Muhammad was reassigned to Security Level S sometime in or around May 2013. ECF No. 13-1, at 1.

Muhammad does not complain of the decision to place him back into segregation, however. Instead, he complains of a 90-day ICA status review hearing held on May 21, 2014, by Defendants Day and Kegley. Muhammad claims at that time to have been charge-free for seven and a half months. Day and Kegley, however, determined that Muhammad should remain in segregation until he again completed the programming series that he had initially completed in December 2012. Muhammad appealed this decision to Defendant Mathena (the Warden of ROSP) and then to the Regional Director, both of whom upheld the determination. Muhammad claims that the ICA decision was made in retaliation for his challenging the authority of Defendant Artrip, who along with Defendant Richeson is in charge of the procedure for stepping down from segregation classification. ECF No. 1, at 2; ECF No. 1-1, at 1; ECF No. 13-1, at 1–2.

b.      *Requirement of Personal Involvement*

As an initial matter, the Court must determine which of the Defendants are potentially liable for Muhammad's claim. An official may only be liable under § 1983 for his or her own

---

[8] Per VDOC Operating Procedure, Security Level S is the designation for segregation, while Security Level 6 is the step-down from Security Level S as the offender transitions to placement in the general population. VDOC Operating Procedure ("OP") 830.2 § IV, ¶¶ A.2, G (Jan. 1, 2015), http://vadoc.virginia.gov/About/procedures/documents/800/830-2.pdf.

[9] Although Muhammad is somewhat vague as to the nature of these charges, it appears that two of them (one for fighting another person, and one for lewd or obscene acts) are the charges at the center of Muhammad's other due process claims in this case. ECF No. 1-1, at 1.

actions. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). This rule also applies to supervisory officials, who may not be found liable under a theory of *respondeat superior*, but instead are liable only to the extent they are personally culpable for the alleged wrong. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Muhammad's filings are not entirely clear as to which Defendants he alleges to be liable for each count. The only Defendants he names in relation to this claim are Day, Kegley, Mathena, Artrip, and Richeson. ECF No. 1, at 2; ECF No. 1-1, at 1; ECF No. 13-1, at 1–2. Logically, therefore, he has not alleged any level of personal involvement by the other Defendants, which could subject them to liability under § 1983.

As to the named Defendants, Muhammad has alleged personal involvement by only Day, Kegley, and Mathena, who all in some way took part in the determination to keep Muhammad in segregation. Although he seems to imply that Artrip and Richeson were responsible for creating the applicable classification procedures, he does not challenge those procedures themselves as inadequate, but instead complains that they were not properly followed in his case. I therefore find that summary judgment on this claim is appropriate in favor of all Defendants—other than Day, Kegley, and Mathena—on the grounds of a lack of personal involvement in Muhammad's alleged injuries.

        *c.*     *Procedural Due Process*

Muhammad alleges that the determination that he remain in segregation was made in violation of procedural due process, as guaranteed by the Fourteenth Amendment. Evaluation of a procedural due process claim requires a two-step analysis. First, the Court must determine whether Muhammad had a protected liberty interest in being released from Level S detention. *See Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015). If he did have a liberty interest in the

classification decision, then the Court must determine whether the Defendants afforded him minimally adequate process in making that decision. *Id.*

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). By virtue of his status as a prisoner, Muhammad does not have an inherent constitutional liberty interest in release from a more restrictive security classification. *Id.* at 221–22. A state-created liberty interest may exist, however, if Muhammad can "point to a Virginia law or policy providing him with an expectation of avoiding the conditions of his confinement," *Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015), and if his continuing confinement in segregation "imposes atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484 (1995). VDOC's policy that ICA "perform periodic reviews on each Security Level S offender," OP 830.2 § IV, ¶ G.7, satisfies the requirement that any potential liberty interest arise from state law or policy. *See Incumaa*, 791 F.3d at 527. The closer question is whether Muhammad has established that his continued confinement in Security Level S was an atypical and significant hardship in relation to the ordinary incidents of prison life.

Defendants cite to *Sandin* and *Hewitt v. Helms*, 459 U.S. 460 (1983), as supporting their positions that "[t]here is no liberty interest in remaining in or being placed in a particular class level," and that "custodial classifications do not create any major disruption in a prisoner's environment." Def. Br. at 10, ECF No. 102. Such broad assertions, however, are not supported by more recent cases. In *Incumaa*—a decision handed down after the Defendants filed their motion—the Fourth Circuit observed that "[w]hether confinement conditions are atypical and substantially harsh 'in relation to the ordinary incidents of prison life' is a 'necessarily . . . fact

specific' comparative exercise." 791 F.3d at 527 (quoting *Beverati v. Smith*, 120 F.3d 500, 502, 503 (4th Cir. 1997)). Courts must first determine a comparative "baseline" that "constitutes the 'ordinary incidents of prison life' for *this particular inmate*." *Id.* (quoting *Prieto*, 780 F.3d at 253)). "Then, with the baseline established, we determine whether the prison conditions impose atypical and substantial hardship in relation to that norm." *Id.* Defendants' assertion that custodial classifications categorically do not implicate a protectable liberty interest is inconsistent with this fact-intensive approach.

It is therefore necessary to determine whether the specific facts made known to the Court so far establish, as a matter of law, that the conditions of Muhammad's confinement are not an atypical and significant hardship in relation to the ordinary incidents of prison life. The Supreme Court's decision in *Wilkinson* provides a helpful comparison. In *Wilkinson*, the Supreme Court considered the conditions at an Ohio "Supermax" facility, which it found to be "synonymous with extreme isolation." 545 U.S. at 213, 214. The Court observed that

> Almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells . . . for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

*Id.* The Court also noted that inmates were prevented from communicating with one another by solid metal cell doors, took all meals alone, and only had rare opportunities for visitation which, when it did occur, was always conducted through glass walls. *Id.* In addition, the Court found it significant that inmates placed in this unit remained there indefinitely (with review of their confinement status occurring only once per year) and were disqualified from eligibility for parole. *Id.* at 224. The Court concluded that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and

10

significant hardship within the correctional context." *Id.* Notably, the Court found this to be true "under any plausible baseline." *Id.* at 223.

Muhammad, meanwhile, has alleged that his confinement in Security Level S precludes him from earning good conduct credit toward his sentence, participating in vocational and religious programs, performing jobs, accessing the law library, or having contact visits. Pl. Br. at 2, ECF No. 104. In addition, Muhammad has attached to his amended complaint statements given in 2012 by Abigail Turner of the Legal Aid Justice Center and Delegate Patrick A. Hope before the United States Senate Judiciary Subcommittee on the Constitution, Civil Rights and Human Rights, regarding the conditions of inmates confined in segregation at ROSP. ECF No. 13-1, at 3–12. This testimony alleges that, similar to the inmates in *Wilkinson*, inmates kept in segregation at ROSP spend 23 hours per day in solitary confinement. *Id.* at 4, 9. Offenders take all their meals alone and "have no group or social activity of any kind." *Id.* Physical restraints are used frequently. *Id.* at 6. There is no limit on how long inmates may be held in segregation, *id.* at 4, 10, although review of their classification status is conducted every 90 days, with a more formal review conducted annually, *id.* at 5. The psychological effects of prolonged isolation, particularly for inmates with mental illness, can be severe. *Id.* at 4–5, 11. These alleged conditions are, in many respects, similar to those at issue in *Wilkinson*, and so may constitute an atypical and significant hardship. The Defendants offered no evidence in support of their motion regarding the conditions of Muhammad's confinement. I therefore cannot find that Defendants have shown, as a matter of law, that Muhammad did not have a protectable liberty interest in being released from Security Level S.[10]

_____

[10] The Defendants appear to address this claim on a Rule 12(b)(6) standard. Accordingly, I withhold judgment as to whether Muhammad's allegations raise a disputed issue of fact that necessitates trial, or whether Defendants may be able to prevail after filing a supplemental

If Muhammad does have a liberty interest in his classification status, then the Court must next determine whether the challenged hearing satisfied the demands of procedural due process. Defendants have not advanced any argument as to the adequacy of the procedures applicable to Muhammad's continuing status in segregation; thus, I cannot find that they prevail on this claim as a matter of law. Furthermore, at this stage I cannot find that they are entitled to qualified immunity.

A qualified immunity defense protects government officials from liability for damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Evaluation of a qualified immunity defense entails a two-part inquiry: whether the alleged facts show the violation of a constitutional right, and whether the right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts have discretion to determine which of these questions to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As explained *supra*, Defendants have not shown that Muhammad has failed to allege the violation of a constitutional right. In addition, Defendants have failed to show that in 2014, the time of the alleged events, Muhammad's right to procedural due process was not clearly established. *Wilkinson*, decided in 2005, plainly stated that conditions of confinement in segregation may impose an atypical and significant hardship and that prisoners therefore have a liberty interest in avoiding those conditions. *Wilkinson*, 545 U.S. at 223–24. Defendants therefore have not proven that they are entitled to qualified immunity. For the foregoing reasons, I recommend that Defendants' motion to dismiss this claim be denied.

---

motion for summary judgment. I find only that the lone argument Defendants have presented—that Muhammad's security classification does not implicate a protected liberty interest *as a rule*—does not show that Muhammad has failed to state a plausible claim.

12

### d. Cruel and Unusual Punishment

Muhammad also alleges that the conditions of his confinement constitute cruel and unusual punishment. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991)). The Fourth Circuit has held that the isolation inherent to segregated confinement is not itself a violation of the Eighth Amendment, even if imposed for an indefinite duration. *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999). The fact that a prisoner's mental illness is aggravated by his confinement in segregation "is an unfortunate but inevitable result of incarceration" and does not amount to "denial of a minimal civilized necessity." *Williams v. Branker*, 462 F. App'x 348, 354 (4th Cir. 2012). Without more, Muhammad's confinement to Level S does not plausibly allege an Eighth Amendment violation. Therefore, I recommend that this portion of Muhammad's claim be dismissed.

### 3. Religious Feast Days

Muhammad's second claim alleges that he was denied the ability to participate in two religious feast days, in violation of the Free Exercise Clause of the First Amendment and RLUIPA. He seeks damages and injunctive relief. ECF No. 13-3, at 1; ECF No. 13-6.

### a. Facts

At the time of the events in question, Muhammad was a practitioner of the Nation of Islam ("NOI") religion. His complaint centers on his observance of Ramadan and the subsequent Eid-ul-Fitr and Eid-ul-Adha feast days in 2014. During Ramadan, the ninth month of the Islamic

lunar calendar, observant Muslims abstain from food and drink from dawn to sunset. Scarberry Aff. ¶ 6, ECF No. 102-1. Eid-ul-Fitr and Eid-ul-Adha are holy days observed by traditional Muslims and the Nation of Islam. *Id.* ¶ 8. Eid-ul-Fitr, the festival of fast breaking, takes place after the end of Ramadan, although the parties dispute the exact date it should be held. The day includes a prayer service and a special meal to celebrate the end of the Ramadan fast. Eid-ul-Adha, the festival of sacrifice, takes place approximately 70 days after the end of Ramadan and also includes a special meal and prayer service. ECF No. 13-3.

Offenders housed at ROSP are afforded opportunities to observe the Ramadan fast and both Eid feasts. The fast dates are provided to VDOC officials by the Islamic Center of Virginia. Scarberry Aff. ¶ 6. Ramadan began on the evening of June 27, 2014, with ROSP offenders receiving their first meal of the fast on the morning of June 28. Ramadan continued until the evening of July 27. Scarberry Aff. ¶ 7. Muhammad claims that Eid-ul-Fitr was observed at ROSP on July 30, 2014, ECF No. 13-3, while Defendants claim it was held on July 28, Scarberry Aff. ¶ 8. Eid-ul-Adha was observed on October 4, 2014. *Id.* ¶ 9.

On May 19, 2014, Defendant Robinson issued a memorandum that outlined VDOC's procedures for the observance of Ramadan and the Eid feasts that year. According to the memorandum, offenders who sought to participate in Ramadan or NOI Month of Fasting had to sign up in advance. Offenders on the Common Fare Program could opt to be temporarily suspended from that program in order to participate in Ramadan or the NOI Month of Fasting, or they could choose to continue receiving Common Fare meals, according to the fasting schedule, during this time. Scarberry Aff. ¶¶ 10-11, Ex. F. Those who participated in Ramadan or NOI Month of Fasting, including those who elected to be temporarily suspended from Common Fare participation, would be able to receive the Eid-ul-Fitr and Eid-ul-Adha feast meals. In addition,

non-Muslim inmates from the general population would also receive the feast meals. Those who elected to continue eating Common Fare during this time would receive Common Fare meals at the Eid-ul-Fitr and Eid-al-Adha feasts.[11] Scarberry Aff. at 15–20. Muhammad asserts that he has never seen this memorandum. ECF No. 1-1, at 2.

Prior to the beginning of Ramadan, Muhammad was given a form to complete if he wished to participate in Ramadan or NOI Month of Fasting. The form indicated that offenders could choose between Sunni Muslim or NOI menus, or they could choose to remain on their Common Fare diet. The form does not indicate that offenders who elected to remain on Common Fare during Ramadan would receive Common Fare meals for the Eid feasts. Muhammad completed the form, apparently electing to continue receiving Common Fare. Scarberry Aff., Ex. F.

On July 28, 2014, Defendant Scarberry notified Muhammad that she had received an email from Defendant Engelke, the Head Food Service Director for VDOC, explaining that offenders who received Common Fare diets during Ramadan would also receive Common Fare meals for the Eid feasts. Muhammad now complains that by receiving Common Fare food during the Eid feasts, rather than food from the designated feast menu, his Ramadan was made "null and void." ECF No. 1, at 2; ECF No. 1-1, at 2; ECF No. 13-3, at 1. Finally, Muhammad complains that Eid-ul-Fitr should have been held on July 28, 2014, the first day after Ramadan, ECF No.

---

[11] Attached to Defendant Scarberry's affidavit are menus for the Eid-ul-Fitr and Eid-ul-Adha feasts, along with "Week 1" and "Week 2" Common Fare menus. Scarberry Aff. at 21–22, 31–32. I cannot determine from this, however, what the Common Fare meal was on the dates of the Eid-ul-Fitr and Eid-ul-Adha feasts.

15

13-3, at 2, while Defendants state that it could be held as late as July 30, three days after the end of Ramadan, Scarberry Aff. ¶ 8.[12]

### b.    Personal Involvement

Muhammad names Scarberry, Walrath, Mathena, Robinson, Engelke, and Clarke as Defendants on this claim. ECF No. 1-1, at 2. Again, however, he does not indicate how some of these Defendants are in any way responsible for the alleged violation of his rights. Muhammad does not even mention Mathena, Walrath, or Clarke in his claim, other than to name them as Defendants. The only allegation regarding Scarberry is that Scarberry told Muhammad about the communications from Robinson and Engelke. Because Muhammad has not alleged any culpable behavior by these Defendants, other than Robinson and Engelke, they should be granted summary judgment on this claim.

### c.    Free Exercise Clause and RLUIPA

The Free Exercise Clause "forbids the adoption of laws designed to suppress religious beliefs and practices." *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). "Its protections, including its directive that no law shall prohibit the free exercise of religion, extends to the prison environment." *Id.* (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). Courts evaluate "prison regulation[s] that impinge[] on an inmate's free exercise rights" using a

---

[12] Muhammad does not appear to challenge ROSP's policy of offering offenders that are housed in segregation an individual prayer service in their cells, rather than a group service. Defendants state that inmates held in segregation, including Muhammad, could not take part in the group services because of security concerns, but that these inmates would have the prayer service in their cells. Scarberry Aff. ¶¶ 12, 15. Other than general statements about the prayer service, Muhammad's sole allegation regarding this issue is as follows: "Let alone I cannot participate in the Eid-Ul-Fitr prayer service." ECF No. 1-1 at 2. Muhammad does not further address the prayer service, and it appears that his complaint focuses on the Eid feasts. *See* ECF No. 1-1 at 2; ECF No. 13-3. In any event, Muhammad has not claimed that he needed to attend a service with other offenders, or that the service held in his cell failed to satisfy his religious beliefs. Thus, even if Muhammad has challenged the prayer service policy, he has not shown that this policy created a substantial burden.

reasonableness standard. *O'Lone*, 482 U.S. at 349; *see, e.g.*, *Jehovah v. Clarke*, 798 F.3d 169, 177–78 (4th Cir. 2015); *Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014). A regulation that substantially burdens an inmate's religious exercise is permissible, *Wall*, 741 F.3d at 499, "if it is reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987).[13] The plaintiff bears the burden of proving that the regulation substantially burdens his sincere religious exercise and disproving the regulation's validity. *Jehovah*, 798 F.3d at 176 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

"RLUIPA provides more stringent protection of prisoners' free exercise than does the First Amendment, applying strict scrutiny instead of reasonableness." *Id.* The statute "prohibits prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a compelling governmental interest by the least restrictive means." *Miles v. Moore*, 450 F. App'x 318, 319 (4th Cir. 2011). It creates a cause of action for equitable relief against any "person acting under color of State law" who imposes a substantial burden on the plaintiff's religious exercise, "even if the burden results from a rule of general applicability." *See* 42 U.S.C. §§ 2000cc-1(a), -2(a), -5(4). "If a plaintiff produces prima facie evidence to support a claim alleging a violation of [RLUIPA] . . . the government shall bear the burden of persuasion on any element of the claim[] except" whether the challenged policy

---

[13] The *Turner* test asks:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006) (quoting *Turner*, 482 U.S. at 89–92) (brackets omitted).

17

"substantially burdens the plaintiff's exercise of religion." *Id.* § 2000cc-2(b); *see Jehovah*, 798 F.3d at 176–77 (4th Cir. 2015).

Both the Free Exercise Clause and RLUIPA require the plaintiff to demonstrate substantial burden of a sincerely held belief. *Cascen v. Clarke*, No. 7:15cv61, 2015 WL 5043121, at *4 (W.D. Va. Aug. 26, 2015) (citing *Holt v. Hobbs*, --- U.S. ---, 135 S. Ct. 853, 862 (2015); *O'Lone*, 482 U.S. at 345). Muhammad must show that the challenged conduct "implicates his religious exercise" and that his complaints are "sincerely based on a religious belief and not some other motivation." *Holt*, 135 S. Ct. at 862. For purposes of summary judgment, I find that Muhammad has demonstrated a sincerely held belief that the Eid-ul-Fitr and Eid-ul-Adha observances should include a "special meal." ECF No. 1-1, at 2.

Muhammad must then show that his sincerely held beliefs were substantially burdened. Under RLUIPA, "a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Substantial pressure "directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forgo religious precepts or from pressure that mandates religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004); *accord Lovelace*, 472 F.3d at 187 (citing *Midrash Sephardi*, 366 F.3d at 1227). Muhammad signed up for Common Fare and elected to continue with it during Ramadan. From the sign-up sheet and Muhammad's allegations, it appears that he was not informed that he would receive his regular Common Fare meal for the Eid feast meals if he remained on Common Fare. Even so, he has never indicated that the feast

18

meals must include certain foods or explained why his Common Fare meal was inadequate. Thus, he has not demonstrated that the Defendants substantially burdened his participation in a suitable Eid feast by providing him with his religiously-based diet. *See Depaola v. Va. Dep't of Corrs.*, No. 7:12cv592, 2013 WL 6804744, at *4 (W.D. Va. Dec. 20, 2013); *Muhammad v. Wade*, No. 1:09cv939, 2011 WL 837125, at *7 (E.D. Va. Mar. 2, 2011).

Finally, Muhammad has not demonstrated a genuine, material dispute that Eid-ul-Fitr was observed on the wrong date. He has simultaneously claimed that the Eid-ul-Fitr feast should be held within three days after the end of Ramadan (making ROSP's selected date of July 30, 2014, appropriate), ECF No. 13-3, at 1, and that the feast needed to be held on the first day after Ramadan, ECF No. 13-3, at 2. ROSP held the Eid-ul-Fitr feast within three days of the end of Ramadan in accordance with the guidance provided by Muslim religious authorities. Considering Muhammad's uncertainty about the requirements for when to hold the feast and the Defendants' appropriate scheduling of it, I cannot find that Muhammad's religious beliefs have been impinged, much less that they have been substantially burdened. For these reasons, I find that the Defendants are entitled to summary judgment on this claim.

### 4. *Common Fare Diet*

Muhammad also claims that the Common Fare diet he receives at ROSP is incompatible with his NOI dietary restrictions. He alleges violations of the Establishment Clause and RLUIPA and names Scarberry and Engelke as Defendants, though he does not specify in any detail how these Defendants were culpable in the alleged violations. ECF No. 1, at 2; ECF No. 1-1, at 3; ECF No. 13-2. Because he has failed to allege personal involvement on the part of these Defendants, they are entitled to summary judgment in their favor.

Furthermore, Muhammad's challenge to the Common Fare diet is unfounded. Muhammad claims that Common Fare only accommodates for Jewish dietary restrictions and that it violates a number of NOI dietary requirements. He asserts that NOI tenets require him to have three hot meals per day and forbid him from eating pork or pork byproducts, which he claims are present in a number of Common Fare foods.[14] He also states, without explanation, that cold vegetarian beans, bran flakes, cornflakes, tuna fish, soybean-based products, eggs, mayonnaise, and cold vegetables are all violations of his religious requirements. *Id.* He provides no evidence, however, that NOI actually imposes these requirements, or that his beliefs are sincerely held.

Defendants state that Muhammad's characterization of Common Fare as violative of NOI beliefs is factually incorrect. Both Scarberry and Engelke assert that Common Fare is designed to accommodate all known religious dietary restrictions, including those for NOI. Scarberry Aff. ¶ 5; Engelke Aff. ¶ 5, ECF No. 102-2. All food items in Common Fare meals, except for fruits and vegetables, are certified kosher or halal, and are prepared in accordance with kosher and halal requirements. Scarberry Aff. ¶ 5; Engelke Aff. ¶ 5. Common Fare food is stored, prepared, and served separately from other food items. Scarberry Aff. at 8. Pork and pork derivatives are never used in Common Fare food. *Id.* ¶ 5. Muhammad cites no evidence in support of his disagreement about the content and preparation of Common Fare. Moreover, some of his complaints are not founded on religious beliefs. He asserts that dairy products are not suitable because he is lactose intolerant, and he objects to peanut butter because it makes him constipated. ECF No. 102, at 4–5.

---

[14] Specifically, Muhammad alleges that pork or pork byproducts are present in cottage cheese, margarine, white bread, peanut butter, and jelly. ECF No. 1-1, at 3.

Finally, even if parts of the Common Fare menu go against Muhammad's individual sincerely held beliefs, Defendants have shown that accommodations for individual offenders' preferences are simply not feasible from an administrative and financial standpoint. Engelke Aff. ¶¶ 6–7. VDOC recognizes 28 different religions, and approximately 3,000 offenders currently participate in Common Fare. *Id.* ¶¶ 4–5. The financial costs, labor needs, and administrative burdens of separately accommodating the dietary needs of each recognized religion, let alone the variations among individual offenders, would be extraordinarily high. *Id.* ¶ 6. Furthermore, requiring such accommodations would entail operational difficulties, including increases in inmate movement and the addition of inmate kitchen staff, which could aggravate security concerns. *Id.* ¶ 6. This Court has previously found the Common Fare program acceptable in the face of challenges under RLUIPA, recognizing that Common Fare furthers compelling state interests by the least restrictive means and that accommodating the preferences of individual inmates would be cost-prohibitive. *Brown v. Mathena*, No. 7:14cv20, 2014 WL 4656378, at *5 n.6 (W.D. Va. Sept. 16, 2014); *Coleman v. Jabe*, No. 7:11cv518, 2013 WL 4084762, at *2, 5 (W.D. Va. Aug. 13, 2013). For the foregoing reasons, I recommend that summary judgment be granted in favor of the Defendants on this claim.

5. *Fight with Other Inmate (Claims IV and V)*

Muhammad claims that VDOC officials are responsible for injuries he sustained when he was attacked by Derrick Bratcher, another inmate, on January 5, 2013. He also alleges that he was unfairly disciplined for his involvement in the incident. He argues that the officials violated his Eighth Amendment right against cruel and unusual punishment by failing to prevent or break

up the attack and violated his Fourteenth Amendment right to procedural due process by disciplining him.[15] ECF No. 1-1, at 4; ECF No. 13-4, at 1–2.

    *a.    Facts*

On January 5, 2013, Derrick Bratcher—another inmate and, according to Muhammad, a known gang member—attacked Muhammad outside of his cell. Muhammad states that Bratcher punched him twice in the face and knocked him over with a third punch in the chest. He then states that Bratcher attempted to stomp on him while he was on the ground, but that he caught Bratcher's leg and attempted to drive him to the ground. Muhammad maintains that he never fought back against Bratcher, but instead only acted to hold off Bratcher. ECF No. 13-4, at 1.

Muhammad claims that while Bratcher was attacking him, Defendant Bishop attempted to step in and intervene, but Defendant Coyle held him back by grabbing his wrist. *Id.*; ECF No. 136 at 2. Muhammad claims that Coyle told Bishop that Muhammad "has had this coming for a long time now," stating that Muhammad was a "snitch" and that the beating was necessary to stop him from "telling on us, filing lawsuits against us." ECF No. 13-4, at 1. Meanwhile, another corrections officer had told Defendant Vaughan, the control booth gun officer, about the fight.

---

[15] Muhammad brings his claims under a number of other legal theories as well, all of which I find meritless. He asserts that the Defendants' actions constituted a violation of the Fourteenth Amendment's Equal Protection Clause and that their failure to stop the assault was a violation of due process, ECF No. 1-1, at 4, but provides absolutely no facts or argument in support of these theories. In addition, Muhammad claims violations of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq.*, and the First Amendment's right to petition the government for redress of grievances. ECF No. 13-4, at 2. These claims are apparently made in light of what Muhammad views as actions by ROSP officials to frustrate his attempts to file grievances related to the assault and his subsequent discipline, and thereby exhaust his administrative remedies prior to filing in court. *Id.* Access to a prison's grievance procedure, however, is not a substantive right. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Muhammad's difficulty exercising his "right" to administrative exhaustion therefore is not a cognizable injury under § 1983. *Barbour v. W. Reg'l Dir. VDOC*, No. 7:08cv98, 2008 WL 5062126, at *5 (W.D. Va. Nov. 26, 2008), *aff'd sub nom. Barbour v. W. Reg'l Dir., Va. Dep't of Corr.*, 324 F. App'x 282 (4th Cir. 2009). Moreover, the Defendants have not argued that Muhammad's claims should be barred for failure to exhaust administrative remedies.

Vaughan shot his assault rifle once in the direction of Bratcher, although Muhammad laments that "he shot completely in the air." *Id.* The fight finally ended when K-9 officers arrived and ordered Muhammad and Bratcher to get to the ground, to which they complied. *Id.*

In an affidavit attached to Defendants' brief, Bishop disputes parts of Muhammad's version of events. He states that Muhammad and Bratcher were fighting, as opposed to Muhammad's characterization of the incident as a one-sided assault by Bratcher. Bishop Aff. ¶ 4. Bishop asserts that once he saw Muhammad and Bratcher fighting, he gave orders for all inmates to stop and lay down on the floor, which Muhammad and Bratcher ignored. He then notified the control room, and Vaughan gave additional verbal orders and fired a shot from his gun. K-9 units then arrived, at which point Muhammad and Bratcher stopped fighting and got on the ground. *Id.* Bishop asserts that Coyle never attempted to restrain him from intervening or made any statement about Muhammad being a snitch. *Id.* ¶ 5. Instead, Bishop states that he did not physically intervene for safety concerns. He is trained not to intervene, but instead to give verbal commands and notify other staff members who could take additional steps, such as firing a warning shot or utilizing K-9s. *Id.*

As a result of the fight, Muhammad received disciplinary charges for disobeying a direct order and fighting with any person. Counts Aff. ¶¶ 4, 6, ECF No. 102-3. Defendant Counts conducted a hearing for these charges on January 9, 2013. *Id.* ¶¶ 5, 7. Muhammad requested that Counts consider the surveillance footage of the incident as evidence, which she declined to do. *Id.* ¶ 5. Muhammad was found guilty on each charge. He was penalized with 20 days loss of telephone privileges for the charge of disobeying a direct order and was fined $12.00 for the charge of fighting with any person. *Id.* ¶¶ 5, 7. Muhammad's appeals to Mathena were unsuccessful. *Id.* at 45–46, 49–50.

Muhammad names as Defendants to these claims Coyle, Bishop, Vaughan, Kiser, Lyall, Artrip, Franklin, Miller, Counts, Shortridge, Mathena, and Rena Mullins. ECF No. 13-4, at 2–3. He has not alleged any involvement whatsoever by Kiser, Lyall, Artrip, Franklin, Miller, or Shortridge; thus, those Defendants should be granted summary judgment in their favor. Mullins, a Human Rights Activist for VDOC, is named for her involvement in frustrating Muhammad's attempts to utilize the grievance process, ECF No. 13-4, at 3, which is not a cognizable claim. *See supra*, n. 15. It is also unclear to what extent Muhammad alleges that Mathena is culpable for his injuries. It is not disputed that, on appeal, Mathena upheld the guilty findings on each charge. Counts Aff. at 45–46, 49–50. Muhammad also seems to allege, however, that Mathena bears some responsibility for Bratcher's attack because instead of fighting back, Muhammad tried to hold off Bratcher and wait for security intervention, as is suggested in ROSP's Offender Orientation Handbook, written by Mathena. ECF No. 13-4, at 1. This does not amount to direct personal involvement in that incident by Mathena, and the policy itself does not amount to deliberate indifference to inmate safety. Therefore, I will address only the merits of the failure to protect claim as to Bishop, Coyle, and Vaughan, and I will address only the merits of the due process claim as to Counts and Mathena.

*c.   Failure to Protect*

In accordance with the Eighth Amendment's prohibition of cruel and unusual punishment, prison officials have a duty to protect inmates from acts of violence committed by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The scope of this duty is far from absolute, however. In order to state an Eighth Amendment claim for failure to protect an inmate from violence at the hands of another inmate, a plaintiff must make two showings. "First, the

24

deprivation alleged must be, objectively, 'sufficiently serious.'" *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *Farmer*, 511 U.S. at 834); *accord Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834) ("For a claim based on failure to prevent harm, the plaintiff must show that he was 'incarcerated under conditions posing a substantial risk of serious harm.'"). "Second, a prisoner must present evidence that the prison officials had a 'sufficiently culpable state of mind.'" *Odom*, 349 F.3d at 770. To meet this prong, the plaintiff must show deliberate indifference on the part of the officials. *Id.* Deliberate indifference entails "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 835).

Muhammad claims that, as a result of Bratcher's attack, he suffered head injuries and optic nerve damage, resulting in a variety of vision problems. ECF No. 13-4, at 3. This allegation of injury is sufficiently serious to satisfy the objective component of the Eighth Amendment test.

As to the question of deliberate indifference, Muhammad does not seem to allege that any of the Defendants were in a position to stop his attack before it commenced and simply refused to do so. Instead, he claims that they failed to take adequate steps to intervene once the attack had started. It is not entirely clear what steps Muhammad expected each Defendant to take, however. With respect to Vaughan, Muhammad has not alleged any sort of undue delay or failure to act. Instead, he apparently believes that Vaughan was required to shoot directly at Bratcher, rather than firing a warning shot in the air. The court does not agree. It is not reasonable to expect an officer to use lethal force on a participant in a fistfight, and the potential downsides of requiring this use of force are obvious. With both inmates fighting each other in close proximity, there would be a fair chance that a shot aimed at Bratcher could mistakenly hit

25

Muhammad or a bystander instead. Furthermore, a prison official should not be faced with the dilemma of having to choose between not firing at the attacker and facing liability for failure to protect, or firing at the attacker and facing liability for use of excessive force. Vaughan's decision to fire a warning shot before escalating to a higher degree of force was appropriate under the circumstances, and it does not amount to deliberate indifference. Summary judgment should therefore be granted in his favor.

Similarly, Muhammad's allegations against Bishop do not create a reasonable inference of deliberate indifference. A guard may be liable for refusing to intervene and break up a fight between inmates if there is no good reason for his failure to act. *Kartman v. Markle*, 582 F. App'x 151, 154 (4th Cir. 2014); *see also Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) ("[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so."). Under Muhammad's version of events, however, Bishop had no reasonable opportunity to intervene because he was physically restrained when he attempted to do so.[16] Summary judgment should therefore be granted in Bishop's favor.

The same cannot be said for Muhammad's allegations against Coyle, however. Accepting Muhammad's well-pleaded facts as true, Coyle not only failed to take any steps to break up the attack, but also deliberately restrained another officer from intervening because Coyle believed Muhammad deserved the beating. These allegations would certainly justify a finding of

---

[16] I note that Defendants dispute this version of events, and claim that Bishop did not physically intervene because, for safety reasons, he is trained only to give verbal commands and notify other staff members. Bishop Aff. ¶ 5. Muhammad alleges that Bratcher struck him two or three times, and it appears that the fight lasted only a few moments before guards arrived with the K-9. Additionally, Officer Vaughan fired a warning shot during the fight. Under these circumstances, Bishop would be entitled to summary judgment because his response was reasonable given the situation.

deliberate indifference. *See Kartman*, 582 F. App'x at 154. Defendants dispute Muhammad's description of events, and urge the Court to accept Bishop's statement that Coyle never prevented him from intervening. This is not the proper stage of the litigation to make such a credibility determination, however. Although Defendants insist otherwise, Muhammad has not simply made conclusory allegations against Coyle. The allegations in his amended complaint with regard to Coyle are well-pleaded assertions of fact that claim Coyle took specific actions and made specific statements. Muhammad has asserted similar facts by affidavit. Muhammad Aff. at 2, June 28, 2015, ECF No. 136. Furthermore, Muhammad has submitted Bratcher's declaration, which states that on several occasions prior to the attack a prison official had told him that Muhammad was a snitch. ECF No. 4, at 32. Although Bratcher does not name Coyle in his declaration—he instead names another officer who is not a Defendant in this case—a reasonable juror could find that this declaration supports an inference that prison officials sought to label Muhammad as a snitch, which could create a risk of him being attacked. This inference, in turn, could lend support to Muhammad's assertions. Muhammad has thus raised an issue of triable fact on this claim. In addition, to the extent Defendants claim that Coyle is entitled to qualified immunity, that defense is unfounded because Muhammad had a clearly established right to avoid assault by another inmate that was either instigated or unreasonably allowed to continue by a corrections officer. *See Odom*, 349 F.3d at 772–74. Therefore, I find that a genuine dispute in material fact exists and, thus, Coyle is not entitled to summary judgment.

> d.    *Disciplinary Proceedings*

The nature of Muhammad's claims relating to the disciplinary actions against him is far from clear. To the extent he seeks a ruling that the finding of guilty on these charges was wrongly decided, he is not entitled to any relief. Federal courts will not disturb a disciplinary

hearing officer's findings of fact unless those findings were arbitrary and capricious or an abuse of discretion. *Sales v. Murray*, 862 F. Supp. 1511, 1516 (W.D. Va. 1994). Counts found, based on the written disciplinary reports and Muhammad's own statements, that Muhammad was guilty of both charges. Counts Aff. ¶¶ 5, 7; Encl. B, D, ECF No. 102-3 at 44, 48. She determined that Muhammad had been given an order to stop fighting, which he did not obey, and that rather than retreating from the fight, Muhammad fought back, rather than removing himself from the fight, by grabbing Bratcher around the neck and the leg in self defense. *Id.* On appeal, Mathena determined that Counts's decisions were supported by the evidence. *Id.* at 45–46, 49–50. Both Counts and Mathena gave written explanations of their reasoning, *id*. at 44–46, 48–50, and Muhammad has not shown that these decisions were arbitrary or an abuse of discretion.

To the extent Muhammad seeks damages against Counts and Mathena, the Defendants assert that they are entitled to immunity. The absolute immunity traditionally afforded to judges for actions taken in their judicial capacities also extends to executive officials "whose participation and role in administrative adjudicatory proceedings could be said to be 'functionally comparable to that of judge' in the typical judicial proceedings." *Ward v. Johnson*, 690 F.2d 1098, 1105 (4th Cir. 1982) (en banc) (citing *Butz v. Economou*, 438 U.S. 478, 508–17 (1978)). Whether an official's role is functionally comparable to that of judge depends on the nature of the proceedings at issue. *Id.*

> To qualify for absolute immunity, the action involved must be of a judicial character and the procedure followed in connection with the hearing must include the 'safeguards' of a fair and impartial proceeding . . . . Thus, absolute immunity will not attach to action taken by [officials] whose functions may be properly classified as administrative or investigative rather than adjudicatory. Moreover, the procedure followed in the hearing must insure for the accused inmate, as far as reasonably practical, similar rights to those the typical judicial defendant would be entitled to before a tribunal realistically insulated from prejudicial influences or bias and from whose rulings and decisions the inmate would have an effective means of appeal.

28

*Id.* at 1109. *Ward* lists the following "safeguards" as distinguishing formal from informal adjudication:

> (1) the administrative proceedings should be 'adversary in nature;" (2) the officer exercising the adjudicatory power in the administrative proceeding should not be subject to supervision or direction of other employees engaged in investigative or prosecutorial duties; (3) a party should be entitled to offer either oral or written relevant and non-repetitive evidence on his behalf; (4) the record of the proceedings should be duly recorded and, so recorded, should constitute the exclusive record for the decision; (5) the proceedings should be so structured as to assure the exercise by the officer in his decision of independent judgment on the evidence before him; (6) the proceeding should be such as to prevent the danger of retaliatory response by the disappointed inmate to an adverse decision; and (7) there should be reasonable opportunity for the party involved to challenge by appeal the decision.

*Id.* at 1105–06.

Most of these factors were present in the hearing at issue. Muhammad could testify and offer evidence (although, as explained below, Counts had discretion to exclude irrelevant evidence). The hearing was tape recorded, and Muhammad was allowed to submit this record on appeal. Counts Aff. at 45, 49. In addition, hearings officers, such as Counts, are required to be well-trained and impartial, OP 861.1 § IV, ¶ C (Sept. 1, 2011), ECF No. 102-3, and may not have any contact with the reporting officer prior to the hearing, *id.* § IX, ¶ D.2. The only of these factors truly in question is whether Muhammad's hearing was "adversary in nature." Although he was provided with a staff advisor prior to the hearing, he did not have an opportunity to confront the reporting officers in person, as those officers were not required to attend the hearing because Muhammad's charges were deemed not sufficiently serious. *Id.* ¶¶ 5, 7. On balance, however, I find that Counts and Mathena each performed a role that was functionally comparable to that of judge. In addition, I note that the denial of immunity in this case would subject officials such as Counts and Mathena to "a real threat of burdensome and expensive litigation" filed by

29

inmates in response to their decisions on minor disciplinary charges. *See Ward*, 690 F.2d at 1108. For these reasons, I find that Counts and Mathena are entitled to absolute immunity.

Furthermore, Muhammad has failed to show that his right to procedural due process was violated. As to the charge of disobeying a direct order, Muhammad's claim fails because he was not deprived of a protected liberty or property interest. The only punishment Muhammad received for this charge was a temporary loss of telephone privileges, which is not the type of atypical condition that triggers due process concerns. *See Denson v. Bledsoe*, No. 7:06cv193, 2006 WL 2850638, at *3 (W.D. Va. Sept. 29, 2006).

As to the charge of fighting with another person, the $12.00 fine against Muhammad implicates a property interest under the Due Process Clause, in spite of the Defendants' claim to the contrary. *See Burks v. Pate*, 119 F. App'x 447, 450 (4th Cir. 2005) ("A prisoner has a protected property interest in his prison trust account. Therefore, a prisoner may not be deprived of those funds without minimum due process.") (citations omitted). I find, however, that Muhammad was afforded adequate process on this charge.

"Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). Thus, due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). "To determine what procedural protections the Constitution requires in a particular case," courts balance (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the existing procedures and the probable value, if any, of alternative or additional procedures; and (3) the burden added safeguards would impose on the state's fiscal and administrative interests. *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). A prisoner charged with "serious

30

misconduct" is entitled to (1) written notice of the charge at least 24 hours before his disciplinary hearing, (2) a limited opportunity to call witnesses and present documentary evidence, (3) a hearing before an impartial factfinder, and (4) a written record of the hearing officer's findings and the evidence relied upon in convicting him. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Baxter v. Palmigiano*, 425 U.S. 308, 323 (1976).

Liberally construing his claim, the only ground for Muhammad's challenge to the disciplinary hearing process was that Counts declined to review surveillance footage of the altercation between him and Bratcher. Muhammad contends that the video would have shown that he acted in self-defense. Counts states that she did not view the surveillance video because it did not have any audio and it was in her discretion to determine whether to watch it. Counts Aff. ¶ 5. Officials have discretion to exclude evidence that is irrelevant or unnecessary. *Zaczek v. Hutto*, 642 F.2d 74, 76–77 (4th Cir. 1981) (citing *Wolff*, 418 U.S. at 566–67).

Counts had evidence before her from Officer Coyle's disciplinary report that Muhammad and Bratcher got into a fight. She also heard testimony from Muhammad that he was involved in the fight, albeit only to defend himself. In the context of disciplinary proceedings, prisoners do not have a right to rely upon a claim of self-defense to a charge of fighting. *Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994); *accord Rudd v. Stansberry*, No. 3:10cv481, 2011 WL 2970925, at *3 (E.D. Va. July 20, 2011).

> Given that there is virtually no support for such a judicially created constitutional right [to self-defense] in the criminal law, we believe that manufacturing such a right for application in non-criminal, prison disciplinary proceedings is even less justified. This is particularly so where prison authorities daily face an intractable problem of violence within the prison walls. A right that threatens to undermine prison discipline by encouraging inmates to combat violence with more violence subverts a core prison function of ensuring order and safety within the institution.

31

*Rowe*, 17 F.3d at 1052–53. Evidence that Muhammad was involved in a fight—even if as he claims it was self-defense—provided at least "some evidence" to support the hearing officer's findings that he committed the charged offense. *See Super'nt, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *see also Donohue v. Lambert*, No. 7:13cv397, 2014 WL 4825258, at *12 (W.D. Va. Sept. 25, 2014) ("If the hearing officer finds the reporting officer's testimony credible, that report is sufficient evidence on which to rest a finding of guilty."). Because all of the evidence, even Muhammad's testimony, supported the charge, Counts could reasonably determine that reviewing the video was unnecessary. *See Jones v. Cross*, 637 F.3d 841, 848–49 (7th Cir. 2011) (finding that prisoner's due process right was not violated when he was denied access to a video that prisoner contended would show he acted in self-defense, because claim of self-defense was not exculpatory in prison disciplinary hearing). For the foregoing reasons, I therefore recommend that summary judgment be granted in favor of the Defendants on Muhammad's due process claim.

6.  *Discipline for Mental Health Group Incident*

In his final claim, Muhammad alleges that he was unfairly punished for an incident in which he urinated on himself during a mental health group class. He argues that officials violated his Fourteenth Amendment right to procedural due process and his Eighth Amendment right against cruel and unusual punishment. ECF No. 13-5, at 4.

a.  *Facts*

On June 2, 2014, Muhammad was to attend a mental health group class that ordinarily started at 1:00 p.m. By 1:55, Muhammad had still not been pulled from his cell for the class. Assuming that the class was cancelled, Muhammad drank eight to ten cups of water, which he says is necessary because of a kidney condition. At 2:25, Defendant Fletcher and another official

32

pulled Muhammad from his cell for class. Although Muhammad had used the bathroom before they arrived, he states that his kidney condition, in combination with the amount of water he had to drink, made him feel as though he needed to urinate again after the class had begun. When the class ended at 4:20, Muhammad informed Fletcher that he needed to urinate and asked her to request a guard to bring him back to his cell. Fletcher went out to tell officers that class had finished, but five minutes later they still had not arrived. Fletcher stepped out again to look for security, at which point Muhammad told her not to turn around because he was urinating in his clothes. When Muhammad was done, Fletcher turned around and provided him with supplies for cleaning the mess from his clothes and the floor. Defendants Murphy, Akers, and Williams arrived a few minutes later, and Fletcher informed them about the incident. After returning Muhammad to his cell, Murphy, Akers, and Williams told Defendant Miller that Muhammad had exposed himself in the class. Miller angrily confronted Muhammad about this and subsequently wrote an offense report charging Muhammad with lewd and obscene acts directed toward or in the presence of another. The offense report was also signed by Defendant Stanley. ECF No. 13-5, at 1–3.

The initial hearing on this charge was scheduled for June 9, but was postponed multiple times before it was ultimately heard on July 9. *Id.* at 3. Fletcher testified at the hearing, and other inmates from the mental health group submitted written statements. These witnesses denied that Muhammad had exposed himself during the incident. *Id.* at 3–4. Consequently, Muhammad's charge was reduced to a lesser included offense for intentionally throwing, smearing, pouring or discarding of bodily fluids. *Id.* at 3. Defendant Larry Mullins conducted a subsequent hearing for that charge on July 23, 2014, and found Muhammad guilty. In reaching his decision, Mullins "determined that there was no real evidence to reflect that A. Muhammad could not wait to go

33

back to his cell to urinate." Mullins Aff. ¶ 8, ECF No. 102-5. Muhammad appealed the decision to Mathena, who upheld it. *Id.* at 47–48.

As a result of the guilty determination, Muhammad lost telephone privileges for 60 days. *Id.* ¶ 8. He also claims to have been removed from his mental health group. ECF No. 13-5, at 3–4. In grievance responses attached to his amended complaint, however, officials clearly inform Muhammad that he can continue to participate in the group. ECF No. 13-8, at 16, 18.

### b.    *Personal Involvement*

Muhammad names as Defendants to this claim Murphy, Akers, Williams, Moceri, Fletcher, Turner,[17] Stanley, Day, Miller, Gallihar, Artrip, Baker, Walrath, and Mathena. ECF No. 13-5, at 2–4. He vaguely alleges that most of these Defendants were responsible for removing him from the mental health group, but does not specify how any of them were involved in that decision. *Id.* at 4. This is not a sufficient level of personal involvement to state a claim under § 1983. Furthermore, Muhammad is very unclear as to how any of these Defendants may have otherwise been responsible for his alleged injuries. I therefore will address only the merits with regard to these Defendants so far as they are specifically included in Muhammad's factual allegations, as set forth above.

### c.    *Procedural Due Process*

Muhammad alleges that his Fourteenth Amendment right to procedural due process was violated during his disciplinary procedure. Muhammad does not allege with any clarity how he was denied due process. The evidence before the Court shows that he was notified of the charge, allowed to submit evidence, was present at the hearing, and was provided with written reasons for the hearing officer's decision. Considering the uncontroverted evidence that Muhammad

---

[17] Muhammad names "Dewayne A.T." in his claim, ECF No. 13-5, at 4, which I construe to refer to Turner.

34

urinated in the classroom, the hearing officer's decision was supported by at least some evidence. Moreover, he has failed to allege the deprivation of a protectable liberty or property interest. The penalty for Muhammad's being found guilty on the charge—60 days' loss of phone privileges—does not implicate a liberty interest that triggers due process protections. *Denson*, 2006 WL 2850638 at *3.

Likewise, Muhammad's alleged removal from his mental health group does not give rise to a due process claim. First, as noted *supra*, it does not appear that this actually happened. Muhammad makes only conclusory allegations that he was excluded from mental health classes. He does not provide a specific instance where his request was denied, and the responses to his grievances state that he "will be allowed to participate in the next [mental health] group." ECF No. 13-8 at 16, 18. In addition, even if Muhammad had been removed from the mental health group, he has not shown that his participation in the group was a protected liberty interest. The Court has been unable to locate Virginia state law authority that guarantees Virginia inmates the ability to participate in a mental health group, such that removal from the group would amount to an atypical and significant hardship in relation to the ordinary conditions of confinement. *Compare Persechini v. Callaway*, 651 F.3d 802, 807 (8th Cir. 2011) (removal from discretionary drug treatment program did not result in an atypical and significant hardship in relation to the remainder of the prison population), *and Walsh v. Corcoran*, No. 98-7853, 2000 WL 328019, at *6–8 (4th Cir. Mar. 29, 2000) (transfer from prison that provided psychiatric treatment and placement in general population in another prison did not deprive prisoner of state-created liberty interest), *with Leamer v. Fauver*, 288 F.3d 532, 545 (3d Cir. 2002) (state law that mandated therapy for certain prisoners as part of their sentences created a liberty interest in receiving that

treatment). Removal from programs and treatment, no matter how beneficial, is an ordinary incident of prison life. *Persechini*, 651 F.3d at 807.

Although Muhammad claims that a court order mandates that he receive inpatient and outpatient mental health and therapeutic drug treatment, ECF No. 13-5, at 4, he has not shown that group therapy is a necessary aspect of this required treatment. Nor has he alleged that he was denied mental health treatment altogether, rather than simply being excluded from his mental health group. For these reasons, I find that Muhammad has not raised a genuine dispute of material fact showing that his convictions implicated a liberty interest or that he was not afforded adequate process.

### d. *Deliberate Indifference to Medical Needs*

In accordance with the Eighth Amendment, prison officials are obligated to provide medical care for inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Denial of care, however, does not rise to the level of a constitutional claim unless officials were deliberately indifferent to a prisoner's serious medical needs. *Id.* at 104–05; *see also De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (noting that "[o]nly extreme deprivations are adequate" to give rise to a claim for deliberate indifference to medical needs). Muhammad has failed to show a deprivation that satisfied these criteria. To the extent he claims that Defendants were deliberately indifferent to his needs regarding his kidney condition, he has not shown that he required any sort of treatment for this condition that was denied. The fact that he attributes drinking large amounts of water and subsequently urinating on himself to his condition, and that he was then punished for this act, does not mean that he was deprived of medical care. At most, he claims that officials disregarded his condition in determining that he was culpable for his disciplinary charge, which is not a deprivation as contemplated by the Eighth Amendment.

36

To the extent Muhammad claims that Defendants were deliberately indifferent to his mental health needs by removing him from group classes, he again has failed to raise a genuine dispute of material fact. Even assuming this actually occurred, Muhammad has not demonstrated that he suffered from "a serious or significant physical or emotional injury resulting from the challenged conditions," or that he faced "a substantial risk of such serious harm resulting from [his] exposure to the challenged conditions." *De'Lonta*, 330 F.3d at 634 (citations omitted). Again, there is no indication that Muhammad was denied mental health treatment altogether, or that participation in the group classes was such a necessary part of his treatment that removal from this class put him at substantial risk of serious harm. Furthermore, Muhammad has failed to show that any of the Defendants actually knew whether his participation in the mental health group was essential to his treatment. *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). For the foregoing reasons, I recommend that summary judgment be granted in favor of all the Defendants on this claim.

C.    *Muhammad's Motion*

I find that Muhammad is not entitled to summary judgment on any of his surviving claims. As to his misclassification claim, Muhammad has not provided a comparative baseline to allow the Court to determine if the conditions of his confinement present an atypical and significant hardship in relation to the ordinary incidents of prison life. Neither party has sufficiently briefed this issue, and Defendants may dispute whether Muhammad's description of the conditions in segregation are accurate. Furthermore, even if Muhammad has a liberty interest in avoiding confinement in segregation, the parties have not squarely presented any arguments as to whether the procedures used were sufficient to satisfy due process.

Meanwhile, with regard to Muhammad's remaining claim against Coyle for failing to protect him from Bratcher's assault, there is a disputed question of fact as to Coyle's involvement in that incident. Although Muhammad argues that Coyle affirmatively restrained Bishop from intervening in the fight, Defendants claim this version of events is not accurate. At the least, these competing allegations of fact preclude summary judgment in Muhammad's favor on that claim.

### III. Miscellaneous Motions

I further recommend that Muhammad's remaining motions be denied. His motion for preliminary injunction, ECF No. 152, puts forward rambling, unsubstantiated allegations of threats made by several ROSP officers, many of whom are not even Defendants to this suit. Muhammad claims that officers used racial slurs and called him an "ISIS terrorist," threatened to have him attacked by gang members once he returned to general population, and told him that they would kill him and make his death look like an accident or suicide. *Id.* at 1–3. He does not specify any requested injunctive relief, other than to be removed from "this very hostile, detrimental environment." *Id.* at 1. It is unclear whether he seeks reassignment to another security classification, removal from ROSP entirely, or some other remedy. Furthermore, Muhammad's allegations are unrelated to the instant suit. The Court has already denied another of Muhammad's motions for injunctive relief that had no factual connection to his underlying claims. *See* ECF Nos. 117–18. Similarly, I recommend that this motion for preliminary injunction be denied, and the Clerk directed to file the motion as a new and separate civil action.

In his remaining motion, Muhammad seeks sanctions against the Defendants for failing to produce a requested document. ECF No. 146. Muhammad has sought production of the VDOC operating procedure that establishes whether corrections officers should intervene in a

38

fight between inmates, *id.* at 1, which Defendants thus far have withheld because of security concerns, ECF No. 130, at 4. Muhammad argues that this document is necessary to evaluate Bishop's claim that he is trained not to intervene in inmate fights. ECF No. 146, at 1. As explained *supra*, Bishop is entitled to summary judgment on grounds unrelated to this argument. The requested document is therefore no longer relevant on the grounds asserted by Muhammad, and his motion is therefore denied. Should Muhammad deem that the requested policy is relevant to the remaining claim against Coyle, he may renew his request. In that event, the Defendants shall provide a substantive response or a detailed objection for withholding the requested policy.

## IV. Conclusion

For the reasons stated herein, I respectfully recommend that the presiding District Judge **GRANT in part** and **DENY in part** the Defendants' motion to dismiss, or in the alternative for summary judgment, ECF No. 101. Summary judgment should be granted in favor of the Commonwealth of Virginia on all claims, and in favor of all Defendants to the extent they are sued in their official capacities for money damages because they are not "persons" under § 1983. Furthermore, summary judgment should be granted in favor of the Defendants on all remaining claims, with the following exceptions. Summary judgment should be denied as to Defendants Day, Kegley, and Mathena on Muhammad's procedural due process claim relating to his security classification. In addition, summary judgment should be denied as to Defendant Coyle on Muhammad's Eighth Amendment claim relating to his assault by another inmate. I further recommend that Muhammad's motions, ECF Nos. 146, 147, 152, be **DENIED**.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such

proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk shall deliver copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTERED: February 1, 2016

Joel C. Hoppe
United States Magistrate Judge

40