| | |
|---|---|
| ABDUL-HAMZA WALI MUHAMMAD,         )<br>        Plaintiff,         )<br>         )<br>v.         )<br>         )<br>RANDALL CHARLES MATHENA, *et al.*,         )<br>        Defendants.         ) | Civil Action No. 7:14cv00529<br><br>**REPORT & RECOMMENDATION**<br><br>By:    Joel C. Hoppe<br>United States Magistrate Judge |

This matter is before me by referral under 28 U.S.C. § 636(b)(1)(B) for report and recommendation regarding Plaintiff's allegation of spoliation of evidence. ECF No. 170. Having considered the parties' arguments and all relevant evidence, I find that spoliation occurred and respectfully recommend that the presiding District Judge order a remedy to cure any prejudice to the Plaintiff resulting from the loss of evidence.

## I. Procedural History

Plaintiff Abdul-Hamza Wali Muhammad, a prisoner at Red Onion State Prison ("ROSP") proceeding pro se, seeks sanctions for spoliation of surveillance video footage of a fight that occurred between Muhammad and another inmate, which is the subject of Muhammad's claim for failure to intervene in violation of the Eighth Amendment ("Claim 5"). He has brought his spoliation claims against Randall Mathena, John McQueen, and Ronald Hall ("Respondents"), who are not parties to Claim 5.[1] Prior to and during discovery, Muhammad filed multiple motions seeking preservation or production of the footage, ECF Nos. 22, 52–53, 98, 112–13, and the Court directed the Defendants in the matter to respond to Muhammad's requests, ECF No.

---

[1] Mathena was originally named as a Defendant to Claim 5, but the Court granted him summary judgment as to that claim. He remains a Defendant to Muhammad's other surviving claim for violation of his procedural due process rights (the underlying facts of which are unrelated to Claim 5), although the undersigned Magistrate Judge this day recommended that Muhammad's due process claim be dismissed. McQueen was originally named a Defendant to unspecified claims, but the Court granted him summary judgment as to the entire action because Muhammad never alleged that McQueen engaged in any specific tortious conduct. Hall was never named as a Defendant to any of Muhammad's underlying claims.

119. The Defendants responded by objecting to Muhammad's request for production of the footage, stating that it had been automatically recorded over before Muhammad requested that it be retained. ECF No. 123. In response, Muhammad made multiple filings seeking sanctions for spoliation of the video, including default judgment. ECF Nos. 125–26, 132, 134–39, 141, 144. The Court denied Muhammad's request for default judgment and his cumulative filings, but allowed him to make his spoliation argument for purposes of summary judgment or at trial. ECF Nos. 131, 145.

On March 17, 2016, the presiding District Judge entered an order granting in part and denying in part the Defendants' motion to dismiss and/or motion for summary judgment and referring the matter to the undersigned Magistrate Judge for conduct of appropriate proceedings and submission of a report and recommended disposition of Muhammad's spoliation allegation. ECF Nos. 169–70. On April 15, 2016, the undersigned Magistrate Judge entered an Order requiring the parties to submit briefing and additional evidence on Muhammad's spoliation claim. ECF No. 174. The parties filed briefs with affidavits and documentary evidence attached, ECF Nos. 181 ("Pl. Br."), 187 ("Resp. Br."), 189 ("Pl. Reply Br."), and Muhammad has submitted additional arguments, affidavits, and evidence relating to his spoliation claim in miscellaneous filings with the Court, ECF Nos. 172–73, 178, 182, 186, 190, 198. The Court held an evidentiary hearing on October 12, 2016, where it heard witness testimony and admitted exhibits into evidence. ECF Nos. 203–04. The matter is ripe for decision.

II. Facts

In his underlying claim, Muhammad alleges that on January 5, 2013, Defendants C. Bishop and J.W. Coyle (who are not included as Respondents to his spoliation allegations) failed to intervene when he was attacked on his pod floor by Derrick Bratcher, another inmate, after

2

they had been released for recreation.[2] He claims that Bratcher shoved him, punched him in the face and chest, and attempted to stomp on him while he was knocked onto the ground, but that he never fought back, instead only acting to hold off Bratcher. ECF No. 13-4, at 1. He alleges further that while the attack was ongoing, Bishop initially attempted to intervene, but Coyle grabbed Bishop by the wrist and told him to let the beating continue, after which Bishop stood by and refused to take any more action. *Id.*; ECF No. 136; ECF No. 173, at 5. The attack then continued until K-9 officers arrived and ordered Bratcher and Muhammad to get to the ground. ECF No. 13-4, at 1. Bishop disputes Muhammad's account, claiming that Coyle never restrained him from intervening, but rather that he and Coyle could not intervene for safety reasons, in accordance with their training. Bishop Aff. ¶ 5, ECF No. 102-4. Bishop also describes the altercation as a fight between the two inmates, rather than a one-sided attack as Muhammad claims, and states that Muhammad and Bratcher ignored a warning shot and verbal commands to stop fighting. *Id.* ¶ 4.

Muhammad received disciplinary charges for disobeying a direct order and fighting against Bratcher, and a disciplinary hearing was held on January 9. Counts Aff. ¶¶ 4–7, ECF No. 102-3. At the disciplinary hearing, Muhammad requested that the hearing officer review the surveillance footage, which the hearing officer declined to do because she did not find it necessary.[3] *Id.* ¶ 5; Resp. ex. 2, at 3, ECF No. 204-2. Muhammad was found guilty of both charges, and he appealed the hearing officer's decisions to Mathena, the warden at ROSP. Counts Aff. ¶¶ 5, 7. Mathena upheld the guilty findings in written decisions issued on February

---

[2] In reciting the parties' allegations concerning the circumstances of the fight, I do not make any finding of fact as to the veracity of the allegations.

[3] Per operating procedure in force at the time of the hearing, the hearing officer had discretion to determine whether the review of video evidence was necessary for resolution of a disciplinary charge. *Id.* ¶ 5; Resp. ex. 4, at 33, ECF No. 204-4.

20, 2013. Resp. ex. 1, at 3–4, ECF No. 204-1; Resp. ex. 2, at 3–4. In his decision regarding Muhammad's charge for fighting, Mathena stated that the surveillance footage had been reviewed[4] and was found to be inconclusive as to Muhammad's actions, but that along with the other evidence before the hearing officer, it was sufficient to uphold the finding of Muhammad's guilt. Resp. ex. 2, at 3–4.

Muhammad contends that while the appeal of his charges was pending, he sent institutional request forms to Mathena and McQueen, Chief Investigator at ROSP, to preserve surveillance footage of the fight "for future/foreseeable litigation." Pl. Br. 1. He claims that he sent his first request on January 29, 2013, and that neither McQueen nor Mathena provided a response. *Id.* He also claims that he sent additional request forms to McQueen and Mathena every week during the first three weeks of February 2013, but these requests also received no response. *Id.* at 1–2. McQueen and Mathena testified that they did not recall having received these requests (although they confirmed that the forms would have been delivered to whomever the request was addressed), and Muhammad testified that he did not keep copies of them. McQueen also explained that at the time he would not usually retain surveillance footage simply at an inmate's request, but rather would do so only if some other factor were present, such as an issue regarding use of force by a corrections officer, or if the warden or an investigator asked

---

[4] At the evidentiary hearing, Mathena explained that he did not personally review the footage for Muhammad's disciplinary appeal, but instead it was viewed by Sherri Shortridge, the Institutional Operations Manager at ROSP. In her testimony, Shortridge could not recall having viewed the video, but assumed that she had done so based on the written appeal decision and the fact that she typically reviewed offender disciplinary appeals. She was also unable to testify as to the substance of the video. In addition, she explained that the video was stored digitally and that once overwritten it could not be retrieved.

Mathena also testified that the pod where the altercation occurred was monitored by one stationary camera facing down the pod and one pan-and-zoom camera. Footage from both cameras was stored on the same device. Mathena noted that these cameras could capture a large area of the pod, but cautioned that the picture quality at further distances could be poor and the pan-and-zoom camera could be facing away from whatever action was taking place. In addition to these limitations, the hearing officer stated that the footage did not include audio. Counts Aff. ¶ 5.

4

him to save the footage. Furthermore, in an affidavit, McQueen maintained that there would have been no reason to retain the surveillance video in question because Muhammad's argument against his disciplinary charge was determined to be unfounded. McQueen Aff. ¶ 8, ECF No. 187-1.

During the third week of February, Muhammad sent a letter to the Virginia Department of Corrections' ("VDOC") Special Investigations Unit ("SIU") "regarding needing to know if in fact [his] request forms here at the institution were being responded to regarding the video clip/footage of the 1/5/13 incident." Pl. Br. 2. SIU sent a letter to Mathena on March 6, 2013, notifying him that it was in receipt of a letter from Muhammad in which he "state[d] that he was set up to be attacked and his appeals have not been properly addressed." Pl. ex. 1, ECF No. 204-8. It is not clear whether this letter from SIU was sent in response to Muhammad's letter from the third week of February, or whether this was in response to a different request. SIU sent a second letter to Mathena on April 12, 2013, informing him that Muhammad "[w]ants copies of video footage of 1/5/13 for future litigations [sic]." Pl. ex. 2, ECF No. 204-9. It is unclear when Muhammad sent the letter that triggered SIU's second letter.[5] Mathena could not recall receiving this letter, and in his testimony he offered that his secretary would likely have forwarded it to another official rather than show it to him. Mathena testified that he would order preservation of video for instances of excessive force, perimeter breaches, visitor problems, and at the request of an assistant warden, major, supervisor, shift commander, or investigator, but not at an inmate's request. Additionally, he testified that officers alleged to have been involved in an incident, such as Coyle and Bishop, would have no role in determining whether video was preserved.

---

[5] Although Muhammad originally alleged that this letter was written by Hall, Assistant Chief at SIU, Pl. Br. 2, Hall explained in his testimony that the letter had actually been written by his administrative assistant and that he had never seen Muhammad's letter.

5

Muhammad did not retain a copy of either of his letters, nor did SIU, according to Hall, or Mathena.

On April 4, Muhammad filed an informal complaint describing injuries he sustained in the fight and claiming that during the attack "security floor officers and the gunman allowed my attack[,] not intervening until the K-9 dogs arrived." Resp. ex. 3, at 1, ECF No. 204-3. He also stated in his informal complaint that he had "written numerous request[s] to the Chief Investigator to have the video footage saved for further legal litigation [sic]," but had not received a response. *Id.* McQueen received the informal complaint on April 8, and on April 16 he replied, "[a]ny saved video will be provided upon a request from the court." *Id.* Muhammad then submitted a regular grievance on April 17, reasserting his allegation that officers failed to intervene in the January 5 altercation and requesting that the surveillance video be saved for future litigation. *Id.* at 2. In response to this grievance, Muhammad was referred to McQueen's response to his informal complaint. *Id.* at 3. At the hearing, McQueen testified that he could not recall whether he took any action at the time he received Muhammad's informal complaint to determine if the video footage still existed or could be saved.

Respondents have described the procedures relating to preservation of video evidence. McQueen stated that "current VDOC procedures require that video recordings pertaining to cell extractions and other video recordings made to document activities of operations are maintained for 3 years" and that relevant surveillance video footage is "duplicated for retention in compliance with this procedure." McQueen Aff. ¶ 6. He also stated, however, that "[f]or practical purposes, if the subject of the rapid eye [surveillance] video is not known to be at issue within *approximately 90 days*, it is automatically recorded over due to storage limitations." *Id.* (emphasis added). At the hearing, both McQueen and Mathena testified that this ninety-day

6

period was not exact and that video could last anywhere from forty to one hundred days before being overwritten.

In September 2014, VDOC operating procedures relating to offender grievances were updated to add language requiring, "if a grievance is received that references a specific audio or video recording, a copy of the recording shall be made and maintained at the facility." McQueen Aff. ¶ 7; Resp. ex. 6, at 9, ECF No. 204-6; Resp. ex. 7, ECF No. 204-7. In addition, the operating procedure in effect at the time Muhammad submitted his requests for the surveillance footage stated that "[c]opies of grievances . . . will be maintained at the unit for a minimum of three years following final disposition of the grievance," or until the conclusion of any investigation or litigation concerning the underlying matter. Resp. ex. 5, at 11, ECF No. 204-5. This language was also updated in September 2014 to specify that the grievance record to be preserved should include any audio or video records. Resp. ex. 6, at 13; Resp. ex. 7. Prior to this amendment, it does not appear that there was any procedure in place for processing offender requests to retain surveillance footage. McQueen testified that under the new policy, he saves videos to a disc at a prisoner's request, and he has not encountered any storage problems. Mathena testified that prior to the policy change, the high volume of prisoner preservation requests prohibited storing all requested videos, and he estimated the amount of storage necessary at over one terabyte. He acknowledged, however, that the VDOC had been storing videos under the new policy since 2014.

### III. Discussion

Muhammad now contends that ROSP officials deliberately chose not to retain the video because it would confirm his allegations that Coyle and Bishop refused to intervene in the January 5 fight. Pl. Br. 3–5. He seeks $45,000 in "compensatory damages" jointly against Respondents Mathena, McQueen, and Hall, along with $15,000 in "punitive damages" severally against each of these Respondents. Pl. Br. 5–6. At the hearing, Muhammad also requested that

7

the Court instruct the jury at trial that it could make an adverse inference against the Defendants as to the contents of the missing video.

*A.     Occurrence of Spoliation*

Spoliation is "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). The party seeking sanctions for spoliation must show the following elements:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Walker v. Owens*, No. 7:13cv425, 2016 WL 320998, at *2 n.3 (W.D. Va. Jan. 26, 2016) (alteration in original) (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009)).

As to relevance, I cannot conclude, as Muhammad suggests, that the video would have shown Bishop's and Coyle's actions during the January 5 fight. At the hearing, Shortridge, the only witness who viewed the footage, could not recall its contents. In addition, although Mathena testified as to the placement of surveillance cameras in the pod where the fight occurred, this did not clarify whether Coyle or Bishop would have been within the frame at any point in the video.[6] Furthermore, no evidence shows that the video also had audio, and the officer who conducted

---

[6] Muhammad testified that Bishop and Coyle were standing in front of the pod when the fight occurred. Based on Mathena's description of the stationary camera as facing down the pod, this suggests that the Defendants would have been out of the view of that camera. Furthermore, none of the parties have stated what, if anything, was or may have been captured by the pan-and-zoom camera.

8

Muhammad's disciplinary hearing noted that she did not consider the video as evidence because it had no audio.

Nonetheless, there is no question that the fight itself was captured on film, *see* Resp. ex. 2, at 3, and that the circumstances of the fight are relevant to Muhammad's claim of deliberate indifference. For example, the duration and intensity of the fight are both pertinent factors in determining whether it would have been reasonable to expect Bishop or Coyle to intervene. The video also could have been helpful to jurors in weighing the credibility of witnesses at trial based upon the consistency of their testimony with the events caught on camera. Thus, I find that the missing footage was relevant to Muhammad's claim.

A more difficult question is whether the Respondents breached a duty to ensure preservation of the video and did so with a culpable state of mind. "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. Once this duty is triggered, the party must "suspend its routine document retention/destruction policy and implement a 'litigation hold' to ensure the preservation of relevant documents." *Goodman*, 632 F. Supp. 2d at 511.

"In the Fourth Circuit, any level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence, suffices to support a finding of spoliation." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 497 (E.D. Va. 2011) (collecting cases); *see Silvestri*, 271 F.3d at 593 (affirming the trial court's dismissal of the case as a remedy for negligent spoliation); *cf. Cole v. Keller Indus., Inc.*, 132 F.3d 1044, 1047 (4th Cir. 1998) (opining in dicta that "[b]ecause the plaintiff, in fact, destroyed evidence, however innocently, a

jury instruction . . . permitting an adverse inference to be drawn might have been appropriate").[7]
"'Destruction is willful when it is deliberate or intentional,' whereas bad faith destruction occurs when a party engages in destruction 'for the *purpose of depriving the adversary of evidence*.'" *DuPont*, 803 F. Supp. 2d at 497 (emphasis added in original) (quoting *Powell v. Town of Sharpsburg*, 591 F. Supp. 2d 814, 820 (E.D.N.C. 2008)). By contrast, ordinary negligence, "or 'culpable carelessness,' is '[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]'" *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529 (D. Md. 2010) (alterations in original) (quoting *Black's Law Dictionary* (7th ed. 2000)). Negligence or gross negligence, "which is something more than carelessness," may be found where "either the failure to collect or preserve evidence or the sloppiness of the review of evidence causes the loss or destruction of relevant information." *Id.*

Muhammad argues that a duty to preserve the surveillance footage arose when he filed institutional request forms between January and March 2013 requesting that copies of the footage be saved for future litigation. Although the Respondents testified that they could not recall having received these forms from Muhammad, their testimony reveals that such requests would not have been honored. They also testified that prior to the 2014 amendments to the

---

[7] Some more recent cases have suggested, to the contrary, that mere negligence is insufficient to support a finding of spoliation. *See, e.g.*, *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). In *Raynor v. Pugh*, No. 1:13cv1117 (E.D. Va. Oct. 21, 2016), United States Magistrate Judge John F. Anderson, after reviewing the case law, explained that the "more direct decisions from the Fourth Circuit recognize that *any level of fault* can support a finding of spoliation." *Raynor*, slip op. at 13–15 & n.8. I find Judge Anderson's reasoning to be persuasive. As he notes, the distinction between relative levels of fault "is to be considered in determining the appropriate sanction, if any, for failing to preserve or destroying relevant materials once a duty has been established and not in making a determination whether a spoliation claim is valid." *Id.* at 14. Likewise, under the newly amended Rule 37(e), discussed *infra*, varying levels of culpability are relevant to the crafting of sanctions, but as to the threshold question of whether spoliation occurred only a finding of negligent conduct is necessary. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (explaining that the amended rule leaves intact the common-law standard regarding the duty to preserve evidence and that "[t]he rule applies only if the information was lost because the party failed to take reasonable steps to preserve the information"); *see also Raynor*, slip op. at 15 ("The amended rule creates no greater obligation on a party to preserve electronically stored information.").

10

operating procedures, which allowed offenders to file grievances in order to request that surveillance video footage be retained, the decision of whether to save footage was left entirely within the discretion of prison officials. This decision was not based on the offender's request or statement of his intent to file suit, but rather depended on whether the officials themselves felt that the incident in question was significant enough that video needed to be saved.

Although Mathena testified that Muhammad should have utilized the grievance process to make his request, he did not explain why the filing of institutional request forms would not have been sufficient to put officials on notice of the need to preserve evidence. At the time Muhammad allegedly submitted his institutional request forms, there was no procedure in place specifying that the grievance process was the preferred channel for offenders to request the retention of video evidence. Furthermore, Mathena did not testify that he would have treated Muhammad's request differently had he submitted it in a grievance. Thus, no evidence shows that Muhammad's filing of a grievance form would have been more effective than an institutional request in putting officials on notice of potential litigation. I therefore find that the submission of institutional request forms was sufficient to trigger the Respondents' duty to preserve the video.

Aside from this issue—whether, hypothetically, the filing of institutional request forms would be sufficient to raise a duty to preserve evidence—there remain contested questions of fact regarding Muhammad's filing of these forms. The parties still dispute whether Muhammad actually completed and sent out these forms, whether they were written in a manner that would put the recipients on reasonable notice of the potential for future litigation, or whether they were or should have been received by the relevant officials. Neither side finds strong support in the evidence. Muhammad claimed to have sent a number of preservation requests in January and

11

February, but he did not save copies of those requests even though, as he testified at the hearing, he usually saved copies of all such documents. Mathena and McQueen testified that they typically responded to prisoner preservation requests—albeit to deny them—but did not save copies of the requests. Muhammad's account finds some support in the contemporaneous documents submitted to the Court: Muhammad's informal complaint of April 4 refers to his previous preservation requests and the SIU letter of April 12 shows that Muhammad requested a copy of the video. On the other hand, McQueen and Mathena's ability to rebut Muhammad's evidence is hampered by their lack of recollection as well as their practice of not retaining inmate institutional request forms or honoring inmate preservation requests. Although it is a close call, I find that as early as January or February, Muhammad provided notice to McQueen and Mathena of their obligation to preserve the surveillance video footage of the fight.

Furthermore, in addition to the Respondents' negligence in responding to Muhammad's institutional request forms, I also find that McQueen acted negligently by failing to take steps to preserve the footage in response to Muhammad's informal complaint of April 4. There is no dispute that this form was received by McQueen and that it explicitly stated that Muhammad sought to preserve footage for future litigation. The Respondents argue that by the time this was received on April 8, 2013—ninety-three days after the fight occurred—it was too late to save the video. Their testimony at the hearing undermines this argument. Both Mathena and McQueen acknowledged that the supposed ninety-day timeframe in which video could be saved before being overwritten was not a precise figure, but rather an approximation, and they conceded that the video could potentially have survived for as long as one hundred days.

Of course, this does not definitively show that the video was salvageable by the time McQueen received Muhammad's informal complaint. It does, however, show that Muhammad

12

put McQueen on notice at a time when the footage possibly could have been saved. McQueen testified that he could not recall whether he even tried to verify that the video still existed, let alone whether he took steps to save it. Likewise, his response to Muhammad's informal complaint does not indicate that he made any such attempt, but instead states that if the video already happened to be saved, he would not turn it over until he received a court order. Considering the timing of Muhammad's preservation request, McQueen's inaction, and the length of time video is retained before being automatically overwritten, I find that the footage likely existsed as of April 8.

Once the duty to preserve the footage was triggered, it was up to VDOC officials, including the Respondents, to take any further action reasonably necessary to ensure that it was saved for litigation. The combined weight of the evidence—Muhammad's multiple requests to preserve surveillance footage of the fight, the Respondents' apparent indifference to these requests, and the lack of a clear and effective procedure at ROSP to make such requests—leads to the conclusion that the requested video would have been preserved for litigation had reasonable steps been taken by prison officials. That they failed to do so—either because inadequate procedures were in place to ensure that inmate requests were appropriately processed or because the Respondents did not see any need to act on an inmate's request to preserve video evidence—shows that they are culpable for the video's destruction. Accordingly, I find that the officials at ROSP, including McQueen and Mathena, negligently breached their duty to preserve relevant evidence. This evidence, however, does not show that after receiving Muhammad's requests, the Respondents intentionally chose not to preserve the video in an attempt to cover up any malfeasance. The Respondents' lack of awareness of the contents of the video undermines any suggestion to the contrary.

*B.     Attribution of Fault*

This finding of negligent failure to preserve relevant evidence does not end the spoliation inquiry, as it is also necessary to determine the appropriate parties to whom culpability for the loss of the video may be attributed. There is no legal basis for imposing sanctions against the named Respondents within the context of this action. Neither McQueen nor Hall is a party to the suit, and although Mathena is a Defendant in the matter, he is not a party to Claim 5. *See Bolling v. Montgomery Ward & Co., Inc.*, 930 F. Supp. 234, 238 (W.D. Va. 1996) (observing that "the spoliation doctrine applies only to misbehavior by parties"). Any claim for sanctions directly against these individuals would require the assertion of a separate cause of action, *see Victor Stanley*, 269 F.R.D. at 515 n.23, which is not recognized under federal law, *Turner*, 736 F.3d at 282 n.5, or under Virginia law, *Bass v. E.I. DuPont de Nemours & Co.*, 28 F. App'x 201, 206 (4th Cir. 2002) (citing *Austin v. Consolidation Coal Co.*, 501 S.E.2d 161, 163 (Va. 1998)).

Instead, if any remedy is to be had, it must be against the Claim 5 Defendants, Coyle and Bishop. Muhammad has not put forward any evidence showing that either of these individuals was personally involved in any of the decisions that led to the loss of the surveillance video. Moreover, Mathena testified that they would not have had any role in determining whether to save the video. Nonetheless, the culpable acts of other ROSP officials, including the Respondents, may be imputed to them. Ordinarily, the attribution of fault to one party for another's spoliation is analyzed under principles of agency. *See Victor Stanley*, 269 F.R.D. at 515 n.23; *Goodman*, 632 F. Supp. 2d at 522 n.16. In this case, the relationship between the Defendants and the Respondents does not fit neatly within the ordinary understanding of an agency relationship, as there is no indication that the Respondents acted subject to the Defendants' control. *See* Restatement (Third) of Agency § 1.01 (defining agency).

14

The Defendants could therefore argue, with some justification, that absent a conventional agency relationship, the Court should not be able to impute the wrongdoing of other prison employees to them. Such a rule would present a dilemma in the context of prison litigation, however, where the responsibility for preserving evidence may be spread out among multiple officials within an institution[8] and where the institutions themselves are typically immune from suit. *See Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012) (acknowledging that these circumstances potentially "open[] the door for . . . prisons to destroy evidence in all prisoner rights cases"). This concern is compounded where, as here, there is no alternative remedy available against the third parties. *Cf. Bass*, 28 F. App'x at 206 (justifying decision not to recognize a separate tort for spoliation because "ample alternate remedies" were already available against the adverse party).

Another district court has considered the question of attribution in this context and determined that spoliation committed by non-party prison officials could be imputed to defendant officials who did not themselves take part in the spoliation. In *Pettit v. Smith*, 45 F. Supp. 3d 1099 (D. Ariz. 2014), the court reasoned that the state department of corrections, although not a party to the litigation, had a duty to preserve evidence. *Id.* at 1106. It noted that the state itself was responsible for the training and conduct of prison officials, had control over the evidence and the parties' ability to access the evidence, and bore the costs of the defendant officials' legal defense and any damages assessed against them. *Id.* Having determined that the prison breached th duty to preserve evidence, the court then found that these same considerations weighed in favor of imputing culpability for the breach to the defendants (although it stopped

---

[8] Such is certainly the case here, as testimony at the hearing showed that Defendants would not have had any role and in fact had no role in deciding whether to preserve the evidence.

15

short of imposing case-dispositive sanctions on the defendants as a means of holding them individually responsible for the loss of evidence). *Id.* at 1110–11.

This reasoning is also persuasive here. As in *Pettit*, the Respondents in this case are not "disinterested third part[ies]." *Id.* at 1106. Rather, they and Defendants are all employees of either ROSP or VDOC, the institutions that ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners. Even though these institutions themselves are not directly liable for the torts of individual officers and therefore not technically parties to the case, they are, as a whole, implicated in spoliation committed by their employees. *See id.* at 1108–10 (reasoning that, unlike imputing the state's torts to its employees, imputing its spoliation to the individual defendants would not act to "circumvent" Eleventh Amendment immunity and was therefore permissible); *see also Raynor*, slip op. at 30 n.12 (citing *Pettit* and applying a duty to preserve evidence to VDOC despite it not being a party to the action). Furthermore, as explained below, the Defendants here will not be sanctioned in a manner that unduly punishes them for spoliation that they did not personally commit. Instead, I only find that imputation of the Respondents' negligent spoliation to the Defendants is necessary here in order to avoid unfair prejudice to Muhammad.

C.   *Remedy*

Having found that the Defendants bear responsibility for breaching the duty to preserve relevant evidence, it is now necessary to fashion an appropriate remedy. A federal court's authority to provide a remedy for spoliation of electronically stored information ("ESI"), such as the surveillance footage here, is governed by Rule 37(e) of the Federal Rules of Civil Procedure, which states as follows:

16

> If [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e); *see also id.* advisory committee's note to 2015 amendment (noting that Rule 37(e) "forecloses reliance on inherent authority or state law to determine when certain measures should be used").[9]

As explained *supra*, the Respondents did not take reasonable steps to preserve the surveillance video in anticipation of reasonably foreseeable litigation. Moreover, the Respondents have testified that the video can no longer be recovered. Thus, a remedy under Rule 37(e) is warranted. Measures under subdivision (e)(2) are not available where, as here, the spoliation was negligent at worst. Instead, the Court may only take steps under subdivision (e)(1) to the extent necessary to cure any prejudice to Muhammad resulting from the loss of the video.

---

[9] The parties have not raised the issue of whether the amended version of Rule 37(e) should be applied here, even though the amendment was made well after this action was commenced and the relevant conduct occurred. The amendment may still apply retroactively in a case such as this if application of the new rule would be feasible and would not work injustice. *See Raynor*, slip op. at 15. The Fourth Circuit sanctions analysis, which would apply if the amended Rule 37(e) does not, "is arguably less rigorous than that required by the amended Rule 37(e) since the amended version now requires that a court find" a level of culpability that "is tantamount to a finding of bad faith spoliation" in order to impose an adverse jury instruction or default judgment. *Id.* at 16. Nonetheless, I find that applying the amended rule here would not be unjust, as more serious sanctions would not be available to Muhammad even under the more lenient Fourth Circuit standard in light of the minor level of culpability and prejudice here. *Cf. Silvestri*, 271 F.3d at 593 (observing that the court should weigh the egregiousness of the spoliator's conduct and the prejudice caused by the loss of evidence to determine whether a severe sanction is justified).

17

It is important to note that Muhammad has not been irreparably prejudiced. He will still be allowed to testify to his version of events at trial, and, as he has made the Court aware, he also intends to call another inmate as a witness to corroborate his story. In addition, it is uncertain that the video would have actually shown the Defendants' actions during the fight, as Muhammad contends. Nonetheless, at least some prejudice results from the fact that without objective evidence available, the outcome at trial will turn on the credibility of witnesses. In such a situation, where the jury must weigh the testimony of convicted felons housed in a high-security prison against that of their guards, the prisoners will likely be disadvantaged. *See Pettit*, 45 F. Supp. 3d at 1111 (noting the inherent prejudice to the prisoner in these circumstances). Furthermore, unlike Muhammad, ROSP officials had the opportunity to view the video before it was overwritten and could potentially testify that it would have been favorable to the Defendants.

In light of this moderate level of prejudice to Muhammad, I find that limited measures under Rule 37(e)(1) should be employed. This Court has a wide range of discretion in crafting remedies under this subdivision, including measures "such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. At the same time, the Court must ensure that remedies granted under subdivision (e)(1) do not "have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation." *Id.* For this reason, Muhammad's requested relief of monetary damages and an adverse inference instruction are overly punitive and should not be granted.

18

Instead, the Court should forbid the Defendants from putting on evidence relating to the fact of Muhammad's disciplinary charges and conviction (to the extent such evidence would otherwise be admissible) or to the actual contents of the video itself, including the written decision rejecting Muhammad's disciplinary appeal.[10] In addition, the Court should instruct the jury that a recording of the January 5 altercation was made, Muhammad requested that it be preserved, but it was subsequently lost through no fault of Muhammad's, and the jurors should not assume that the lack of corroborating objective evidence undermines Muhammad's version of events surrounding the fight. This instruction, rather than an adverse inference instruction, is appropriate because of the open question about how probative the video would be of Bishop's and Coyle's actions and the lack of intent of the VDOC officials to destroy the video. These measures would work to limit any prejudice to Muhammad, while at the same time avoiding an unwarranted adverse inference against the Defendants.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge find that spoliation occurred and order remedies to cure any prejudice to Muhammad resulting from the spoliation of evidence, particularly in the form of an evidentiary exclusion and jury instruction as described herein.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of

---

[10] At the evidentiary hearing, Muhammad argued that this written summary of the video actually supports his version of events. It is unclear whether he intends to introduce this summary into evidence at trial, but to the extent he does, the evidentiary exclusion would no longer serve any remedial purpose, and the Defendants should be allowed (subject to the requirements of the Federal Rules of Evidence) to use the report to challenge Muhammad's interpretation.

19

> the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk shall deliver copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTERED: December 12, 2016

/s/ Joel C. Hoppe

Joel C. Hoppe
United States Magistrate Judge