IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| ABDUL-HAMZA WALI MUHAMMAD, ) | | |
| Plaintiff, ) | Civil Action No. 7:14cv00529 | |
| ) | | |
| v. ) | **REPORT & RECOMMENDATION** | |
| ) | | |
| RANDALL CHARLES MATHENA, *et al.*, ) | By: Joel C. Hoppe | |
| Defendants. ) | United States Magistrate Judge | |

This matter is before the Court on the Defendants' supplemental motion for summary judgment. ECF No. 175. The motion is before me by referral from Chief District Judge Glen E. Conrad under 28 U.S.C. § 636(b)(1)(B). ECF No. 170. Having considered the parties' pleadings, all supporting materials, and the applicable law, I respectfully recommend that the presiding District Judge grant the Defendants' motion.

I. Procedural History

Plaintiff Abdul-Hamza Wali Muhammad, a prisoner at Red Onion State Prison ("ROSP") proceeding pro se, filed a civil action on September 26, 2014, ECF Nos. 1 through 1-1, and an amended complaint on October 20, 2014, ECF Nos. 13 through 13-6. He brought his action against the Commonwealth of Virginia and over forty persons in their official and individual capacities, asserting a variety of federal statutory and constitutional claims and seeking declaratory, injunctive, and monetary relief. *See generally* ECF Nos. 1 through 1-1, 13 through 13-6.

The Defendants moved for dismissal or summary judgment, ECF No. 101, which the Court granted as to most of the Defendants and all but two of Muhammad's six claims, ECF No. 169. The Court denied summary judgment on Muhammad's first claim, which alleges a violation of procedural due process, as to Defendants Stacy L. Day, Reanne Kegley, and Randall Charles

1

Mathena. *Id.* The Court directed those Defendants to file a supplemental motion for summary judgment in light of the Fourth Circuit's recent decision in *Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015), which was decided after all the briefs had been filed for the initial motion for summary judgment, Mem. Op. 3, ECF No. 168.

The Defendants have filed their supplemental motion for summary judgment, ECF No. 175, along with a brief in support, ECF No. 176. Muhammad has submitted miscellaneous motions and other filings pertaining to his due process claim. ECF Nos. 172–73, 178, 182, 186. The Court has already construed Muhammad's "motions" as additional briefing and evidence in opposition to the Defendants' motion, *see* ECF No. 195, and will also consider the arguments and evidence included in his other filings.

## II. Facts

At the time giving rise to his due process claim, Muhammad was housed at ROSP in security level "S" custody,[1] otherwise known as segregation. Day Aff. ¶¶ 29–30, ECF No. 176-1. Muhammad's due process claim concerns a determination of his security classification level under the Segregation Reduction Step-Down Program, an "incentive-based housing program which creates a pathway for offenders to step-down" to less restrictive security levels. *Id.* ¶ 5. The Step-Down Program allows offenders assigned to administrative segregation at Level S to gain additional privileges and eventually move to reduced security levels by exhibiting positive behaviors. *Id.* ¶¶ 4, 7. Progress through the Step-Down Program is based on the offender's demonstration of improved thought patterns and social skills. Offenders who meet "pro-social

---

[1] Segregation Level S is "a special purpose bed assignment used by ROSP for the protective care and management of offenders." Day Aff. ¶ 5 n.1, ECF No. 176-1. Within Level S, offenders are assigned to one of three "management pathways," and to an appropriate privilege level within each pathway. *Id.* ¶¶ 8–9. Offenders who successfully work through the Segregation Reduction Step-Down Program may be eligible for assignment to Security Level 6, a transitional classification level, and then to Level 5, which is general population. *Id.* ¶¶ 7, 9.

2

goals" and complete the "Challenge Series" cognitive programming are able to move through the Step-Down Program, while those who incur additional disciplinary charges or demonstrate continued behavioral problems are kept in more restrictive segregation conditions until they show improvement. *Id.* ¶¶ 7, 10. The Institutional Classification Authority ("ICA") periodically reviews the classification of prisoners assigned to segregation; this includes both informal hearings and a formal review that must be conducted at least once every ninety days. *Id.* ¶¶ 11–12.

Conditions of confinement in "special housing," including Level S, are highly restrictive. Offenders confined to Level S are guaranteed only five hours of out-of-cell exercise per week. Day Aff. ¶ 23; Operating Procedure ("OP") 830.A, ECF No. 176-1, at 29. They are also subjected to a strip search and placed in shackles with a dual escort whenever they leave their cells. Day Aff. ¶ 23; OP 830.A, ECF No. 176-1, at 29, 45. In other ways, however, living conditions in Level S "approximate those of the general offender population." Day Aff. ¶ 16; OP 830.A, ECF No. 176-1, at 45. Offenders receive the same number and types of meals; are afforded clean laundry and can care for their hygiene; are allowed visits from legal counsel; have access to counseling services, educational services, library books, and religious materials; have the same mail regulations and privileges; and have access to the grievance procedure. Day Aff. ¶¶ 16–27; OP 830.A, ECF No. 176-1, at 29. Without elaboration, Muhammad alleges that his confinement in Level S still precludes him from certain privileges, such as earning good conduct credit toward his sentence, participating in vocational and religious programs, having a job, accessing the law library, or having contact visits. ECF No. 104, at 2. He does not dispute, however, that Level S offenders retain some privileges and that more privileges become available as they progress through the Step-Down Program.

3

Muhammad, who is currently serving a nearly twenty-nine year sentence for burglary and assault convictions, *see* ECF No. 176-3, was transferred to ROSP from Wallens Ridge State Prison in 2012 as a Level S offender. Day Aff. ¶ 29. He successfully completed the Challenge Series and was reduced to Level 6, *id.*, but was reassigned to Level S in June 2013 because he incurred multiple disciplinary charges, *id.* ¶ 30. His due process claim does not relate to any of these decisions; instead, Muhammad challenges a ninety-day formal status hearing held before the ICA on May 21, 2014, in which Defendants Day and Kegley denied Muhammad's request to move out of segregation because he had not completed the Challenge Series after he returned to segregated housing. *See* ECF Nos. 1 through 1-1; ECF No. 13-1; Day Aff. ¶ 32. Muhammad filed a grievance, claiming that he had gone nearly eight months without a disciplinary charge and that he already had completed the Challenge Series when placed in Level 6 in 2013. Day Aff. ¶ 33. Defendant Mathena denied Muhammad's grievance and upheld the ICA decision. ECF No. 182-2, at 1. Muhammad now argues that these decisions violated his procedural due process rights because he asserts that the Virginia Department of Corrections' ("VDOC") operating procedures do not require him to complete the Challenge Series again after he had already successfully moved from Level S to Level 6 once before. *See* ECF No. 13-1. He also alleges that completion of the Challenge Series is optional and therefore not a valid reason for keeping him in Level S. *See* ECF No. 182-2, at 1.

III. Discussion

A.  *Standard of Review*

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014) (per curiam). Facts are material when they

4

"might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists if "a reasonable jury could return a verdict in favor of the nonmoving party." *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) (citing *Anderson*, 477 U.S. at 248).

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Appalachian Power Co. v. Arthur*, 39 F. Supp. 3d 790, 796 (W.D. Va. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party makes that showing, the nonmoving party must then produce sufficient admissible evidence to establish a specific material fact genuinely in dispute. *See* Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007). When deciding a summary judgment motion, the Court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the nonmoving party's favor given the record as a whole. *See Tolan*, 134 S. Ct. at 1866; *Scott*, 550 U.S. at 380. The Court does not weigh evidence, consider credibility, or resolve disputed issues—it decides only whether the record reveals a genuine dispute over material facts. *Tolan*, 134 S. Ct. at 1866.

B.  *Procedural Due Process*

In the context of security classification decisions for prisoners, the analysis and resolution of a procedural due process claim entails a two-step process. First, the Court must determine whether the prisoner has a protectable liberty interest in avoiding the more stringent conditions of confinement in segregation. *See Incumaa*, 791 F.3d at 526. If the prisoner has no protectable liberty interest, then no process is due. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest . . . ."). If a liberty interest does exist, then the Court must evaluate

5

whether or not the prisoner received the minimally adequate process required to protect that interest. *Incumaa*, 791 F.3d at 526.

   1.   *Protectable Liberty Interest*

A liberty interest sufficient to give rise to procedural due process protections "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221 (citations omitted). Although in most cases "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," *id.*, state prison regulations or procedures may create such an interest if the more stringent conditions "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995). As the Defendants acknowledge, Defs.' Br. 14, ECF No. 176, VDOC's policy requiring the ICA to perform periodic reviews of each Level S offender's classification status satisfies the requirement that a potential liberty interest arise from state law. *See Incumaa*, 791 F.3d at 527.

The Defendants dispute, however, that Muhammad's continued confinement in Level S imposed atypical and significant hardship in relation to the ordinary incidents of prison life. This determination "is a 'necessarily . . . fact specific' comparative exercise." *Id.* at 527 (quoting *Beverati v. Smith*, 120 F.3d 500, 502, 503 (4th Cir. 1997)). The Court must first determine a comparative "baseline" that "constitutes the 'ordinary incidents of prison life' for *this particular inmate*." *Id.* (quoting *Prieto v. Clarke*, 780 F.3d 245, 253 (4th Cir. 2015)). "Then, with the baseline established, we determine whether the prison conditions impose atypical and substantial hardship in relation to that norm." *Id.* The Defendants note that the appropriate baseline for comparison here is general population, as Muhammad had first served his sentence in general population before being moved to segregation. Defs.' Br. 15; *see also Prieto*, 780 F.3d at 254

(observing that where "state law mandates the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence, those confinement conditions are, by definition, the 'ordinary incidents of prison life' for such offenders"). Thus, the relevant inquiry is whether the conditions of confinement in Level S present atypical and significant hardship in comparison to the conditions in general population.

The Fourth Circuit observed in *Incumaa* that the Supreme Court has identified three factors that are especially relevant to the question of whether confinement in segregation is atypical and significant: "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." 791 F.3d at 530 (citing *Wilkinson*, 545 U.S. at 223–24). As to the first of these factors, there is little dispute that prisoners housed in Level S are subject to conditions that are more restrictive than those in general population, with minimal privacy or freedom of movement. In other respects, however, conditions in segregation are not substantially different from those in general population. Offenders receive similar meals and provisions for their hygiene, can obtain legal and educational materials, and have access to the grievance procedure. Furthermore, inmates in segregation earn additional privileges as they progress through the Step-Down Program. *See* ECF No. 176-1, at 29–31. The Court is aware that relatively habitable living conditions such as these may not always offset the negative effects that can accompany long-term confinement in isolation, which can be severe. *Cf. Incumaa*, 791 F.3d at 534 (acknowledging that "[p]rolonged solitary confinement exacts a heavy psychological toll"). Here, however, Muhammad has not shown that he was subjected to the sort of prolonged, extreme deprivation of sensory stimuli or social contact that gave rise to the concerns in *Wilkinson*, 545 U.S. at 214 ("OSP inmates are

7

deprived of almost any environmental or sensory stimuli and of almost all human contact" … "for an indefinite period of time"), and *Incumaa*, 791 F.3d at 531 (noting prisoner was subjected to "an exceptional 20-year stint in highly restrictive solitary confinement").

In addition, other factors also counsel against finding that Muhammad had a liberty interest in avoiding continued confinement in Level S. First, there is no evidence that classification to Level S had any collateral consequences on his sentence. Muhammad is ineligible for parole, ECF No. 176-3, at 1, and he has not shown that his assignment to Level S has affected his ability to earn good conduct credit toward his sentence.[2] Furthermore, Muhammad has not shown that his confinement in segregation was indefinite. Under VDOC's operating procedures, his classification status was formally reviewed at least once every ninety days, and his continued confinement depended on whether his behavioral problems ameliorated. In fact, Muhammad's own history of being moved in and out of Level S shows that his confinement there was not indefinite. Moreover, Muhammad does not challenge the initial decision that he be moved to Level S, nor does he allege that due process violations occurred through the duration of his confinement there. Rather, he focuses his challenge on only one of his periodic ICA review hearings. Even assuming that he received inadequate process at the hearing, this would only subject him to another ninety days in Level S before his classification status would be reviewed again—a period of insufficient duration to create atypical and significant hardship, *see Beverati*, 120 F.3d at 504 (holding that six months in segregation under conditions more burdensome than general population did not create atypical and significant hardship).

The combined weight of these factors suggests that Muhammad's continued confinement in Level S did not present atypical and significant hardship. This conclusion is bolstered by U.S.

---

[2] Muhammad's bare assertion that he is ineligible for good conduct credit and attributing that status to his being housed in segregation, made without reference to any applicable law or operating procedure, ECF No. 104, at 2, is insufficient to raise a genuine dispute of material fact.

District Judge James P. Jones's recent decisions rejecting similar claims by other inmates housed in Level S at ROSP. *See generally DePaola v. Va. Dep't of Corr.*, No. 7:14cv692 (W.D. Va. Sept. 28, 2016); *Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15cv230 (W.D. Va. Sept. 28, 2016); *Canada v. Clarke*, No. 7:15cv65 (W.D. Va. Sept. 27, 2016); *Velazquez v. Va. Dep't of Corr.*, No. 7:15cv157 (W.D. Va. Sept. 27, 2016); *Batte v. Clarke*, No. 7:15cv158 (W.D. Va. Sept. 27, 2016); *Vigil v. Clarke*, No. 7:15cv159 (W.D. Va. Sept. 27, 2016); *Mukuria v. Clarke*, No. 7:15cv172 (W.D. Va. Sept. 27, 2016); *Barnard v. Clarke*, No. 7:15cv160 (W.D. Va. Sept. 26, 2016); *Faison v. Clarke*, No. 7:15cv530 (W.D. Va. Sept. 26, 2016).

In those cases, the Court considered claims by inmates who were assigned to the intensive management ("IM") pathway—a classification with more restrictions and fewer privileges than the special management ("SM") pathway to which Muhammad was assigned, ECF No. 176-1, at 56[3]—and found that they did not have a protected liberty interest in avoiding the conditions of their confinement. In addition to finding that the Step-Down Program and review procedures alleviated the more severe aspects of confinement in Level S, *see, e.g.*, *Barnard*, slip op. at 22–24, the Court also explained that the harsher conditions of segregation did not, in and of themselves, create atypical and significant hardship "because general population inmates can expect temporary terms in segregated confinement under similar restrictions," *id.* at 21 (citing *Sandin*, 515 U.S. at 486; and *Beverati*, 120 F.3d at 504). These considerations also hold true here, and I therefore find that Muhammad did not have a protected liberty interest in being released to general population.

    2.    *Minimally Adequate Process*

---

[3] Offenders are assigned to IM if they exhibit "the potential for extreme and/or deadly violence." ECF No. 176-1, at 12. Offenders assigned to SM "may display an institutional adjustment history indicating repeated disruptive behavior" or a history of violent behavior "without the intent to invoke serious harm or the intent to kill." *Id.*

Even assuming that the May 21, 2014, classification decision implicated a protected liberty interest, Muhammad has failed to raise a genuine dispute of material fact as to whether he received sufficient process. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978); *see also Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990) (noting that a claim is not actionable under § 1983 "unless and until" the state deprives the person of his protected interest without due process). Due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

In most cases, the state must provide "notice reasonably calculated, under all the circumstances, to apprise" a person of an impending deprivation, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950), and an "opportunity to be heard 'at a meaningful time and in a meaningful manner,'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Determining whether the plaintiff had "a meaningful opportunity to present [his] case" against deprivation, *Mathews*, 424 U.S. at 349, requires the court to balance (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the existing procedures and the probable value, if any, of alternative or additional procedures; and (3) the burden that added safeguards would impose on the state's fiscal and administrative interests. *Id.* at 335.

As to the first *Mathews* factor, the Supreme Court observed in *Wilkinson* that "[p]risoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." 545 U.S. at 225. Thus, Muhammad's private interest in assignment to a lower security level, "while more than minimal, must be evaluated,

nonetheless, within the context of the prison system and its attendant curtailment of liberties." *Id.* The private interest is most strongly implicated in situations where the prisoner is subjected to extremely prolonged periods of isolation, severe living restrictions, and significant bodily intrusions, and where he lacks meaningful periodic review of his classification status. *See Incumaa*, 791 F.3d at 533–34 (finding a significant private interest in release from segregation where the inmate had been held in solitary confinement for twenty years). Although Muhammad certainly experienced increased restrictions and reduced privacy during his confinement in Level S, he has not shown that these conditions were especially severe. In addition, there is no indication that his periodic ICA status reviews were pretextual or meaningless, such that he would be subjected to extensive periods of isolation without cause.

Regarding the second *Mathews* factor, the Court in *Wilkinson* found protections against the risk of erroneous deprivation sufficient where the procedures in place provided for advance notice of the basis for the classification review, an opportunity for the inmate to provide rebuttal, a written explanation of the reasons for placing the inmate in segregation, multiple levels of appeal for the inmate to challenge the placement decision, and a subsequent review of the inmate's classification following his assignment to segregation. 545 U.S. at 225–27. All of these procedural safeguards are provided for in VDOC's operating procedures, not only as to the initial decision to assign an inmate to Level S, but also as to the periodic review of the inmate's classification status. *See* Day Aff. ¶¶ 11–14, 31–33; ECF No. 126-1, at 20–21, 32–40, 43, 52–53. Moreover, there is no dispute that these procedures were followed throughout the review in question. Muhammad was provided with written notice of his pending ICA hearing, ECF No. 126-1, at 55, attended the hearing in person and received a written record of the ICA recommendation, *id.* at 56, was able to appeal this determination through the grievance process,

11

*id.* at 57, and received written explanations for the denial of his appeals, *id.* at 58–59. These procedures were more than adequate to minimize the risk of an erroneous assignment to segregation.

Furthermore, the third *Mathews* factor weighs against a finding that more procedural protections were necessary. In the prison context, the state's interest in avoiding the burdens of additional procedural requirements "is a dominant consideration." *Wilkinson*, 545 U.S. at 227. Although "the prison's interest does not eclipse [the inmate's] well-established right to receive notice of the grounds for his ongoing confinement and to present his rebuttal to those grounds," *Incumaa*, 791 F.3d at 535, the state has highly important interests in maintaining security and preserving scarce resources, and the Court should take these interests into account before imposing further "elaborate procedural safeguards," *Wilkinson*, 545 U.S. at 228. Thus, this factor also leans in favor of the Defendants.

After considering the three *Mathews* factors on balance, it is clear that the process afforded to Muhammad throughout the proceeding in question was adequate. Moreover, I note that Muhammad has not put forward any coherent argument as to why the procedures already in place were insufficient. Instead, it has become apparent that the crux of his due process claim is his argument that the Defendants should not have required him to complete the Challenge Series again before removing him from Level S. *See, e.g.*, ECF Nos. 182-2, 182-6, 186-3. This argument does not implicate any sort of procedural failure by the Defendants, but instead merely reflects Muhammad's opinion that they failed to follow VDOC policy in the manner he felt appropriate and therefore reached an incorrect result. Such a claim falls outside the ambit of procedural due process and is not actionable as a standalone claim, as it is not the Court's place to determine whether prison staff violated VDOC policies. *See White v. Turner*, No. 7:14cv505,

12

2015 WL 8363084, at *3 (W.D. Va. Dec. 8, 2015) (citing *Riccio v. Cnty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990)).[4] In any case, Muhammad has failed to show that the Defendants denied him constitutionally sufficient process with regard to his May 21, 2014, classification decision.

IV. Conclusion

For the reasons stated herein, I find that the Defendants are entitled to judgment as a matter of law on Muhammad's claim for a violation of his procedural due process rights. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** the Defendants' motion for summary judgment, ECF No. 175, **DISMISS** Muhammad's due process claim (Claim One), and **DISMISS** Defendants Day, Kegley, and Mathena from this action.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk shall deliver copies of this Report and Recommendation to all counsel of record and unrepresented parties.

---

[4] In addition, this theory of recovery has already been dismissed. R. & R. 2 n.3, ECF No. 157.

ENTERED: December 12, 2016

/s/ Joel C. Hoppe

Joel C. Hoppe
United States Magistrate Judge